## CAPITAL DEVELOPMENT CO., Plaintiff,

v.

## The UNITED STATES, Defendant.

### No. 750–87C.

United States Court of Federal Claims.

April 18, 2001.

William F. Lenihan, Seattle, Washington, for plaintiff. Andrew R. Gala, of counsel.

Richard P. Nockett and John Warshawsky, with whom were Assistant Attorney General David W. Ogden, David M. Cohen, and John W. Showalter, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This action is part of a consolidated group of cases arising out of termination by the United States Forest Service ("Service") of timber sales contracts in the Northwest during the 1980's. Capital Development Company ("CDC"), along with other companies, brought actions under the Contract Disputes Act[1] in an effort to have their non-performances of contract declared legally excused and to have the Service's damages claims—here asserted as counterclaims—reduced or set aside. For the reasons which follow, the court finds that the government may recover on its counterclaim, although not in the full amount sought.

### FACTUAL AND PROCEDURAL BACKGROUND

Trial was conducted from October 5 through 11, 1999, in Seattle. The primary issue was the extent, if any, to which the government's counterclaim damages should be reduced or eliminated due to changes in the resale contracts. Many of the factual and legal issues in this group of cases are virtually identical. Consequently, after trial in this case, the parties were given a draft of the court's opinion, which they then used in preparing for a subsequent trial in *Seaboard Lumber Co. v. United States,* 48 Fed.Cl. 814 (2001). After trial in *Seaboard,* the parties agreed that the testimony in *Seaboard* and *CDC* could be cross-utilized. The court entered its opinion in *Seaboard* on March 15, 2001. Because many issues are virtually identical, the court will not go into the detail in this opinion it did in *Seaboard.* Instead, we incorporate by reference into this opinion, as if fully set out herein, our findings and relevant holdings in *Seaboard.* Only points of factual or legal difference will be more fully addressed.

---

1. 41 U.S.C. §§ 601–613 (1994).

Six contracts between CDC and the Forest Service are at issue: Bride, Cougar, Cow, Pearl, Ram, and Short Flat. They all involve timber on Forest Service managed lands in Washington State. The contracts were executed between late 1982 and 1985. In five of the six contracts, breach by CDC is established. In the sixth contract, Cow, CDC asserts that defendant was actually the breaching party because the Forest Service refused to grant an additional one year extension of CDC's period of performance. Pursuant to contract provisions, all six were offered for resale. All six were "deficit" resales, in that the contracts were offered at base rates. This was because the appraised value was less than base rates. Base rates are the higher of either reforestation costs or statutory minimum bid rates per species. There were no bidders on the Cougar and Short Flat contracts. The terms of the resale offers were not identical to the original sales. Partly this is due to the fact that, at the time the contracts at issue were offered for resale, new regulations had changed the terms under which contracts could be entered. The cash down payment requirement on all the contracts was doubled, from five to ten percent. Midpoint payments were added on two of the contracts, Cow and Ram. The other four sales already had midpoint payment requirements. In addition, in the case of five of the attempted resales, there was a decrease in the length of the contract term. In one, Cougar, the term increased. The government has conceded that some of those changes had a material effect on the amounts of resale bids.

Four of the contracts resold. On March 4, 1987, with respect to such resales, David Unger, the Acting Associate Deputy Chief of the Service, issued a directive to contracting officers to make adjustments to the demand for damages to reflect the impact of these changes and set out a formula for doing so. The Contracting Officer ("CO") decisions in this series of contracts, dated March 20, 1987, made an adjustment for only the mid-point payment. Later, after this action commenced, Christine Anderson, Assistant for Timber Management Sales to the Regional Forester and the government's lead witness on timber sale practices, made another adjustment for down payment changes, pursuant to the same directive. Ms. Anderson explained at trial how these adjustments were calculated. Her adjustment, combined with the earlier CO adjustment, along with an adjustment taking account of cash on deposit, and an adjustment for calculating interest on a 365 day year, lowered the demand by the government from $189,306.75 to $160,454.12.[2]

Unger's direction adjusted for the time value of the midpoint payment over ½ of the contract term, based on the assumption that the contractor would harvest at a uniform rate from the midpoint through termination. The contractor would "use up" the midpoint payment 25% of the way through the second half of the contract term. Unger's direction also adjusted for the loss of the down payment through the midpoint of the contract, for example, for two years of a four year contract. Christine Anderson used one half of the down payment in her calculations since she was adjusting for the change from a 5% to a 10% down payment. The agency applied the current rate of interest prescribed by the U.S. Dept. of Treasury (TFPM 6–8020.20) as published in the Federal Register.

With the exception of the Cow contract, the sole issue remaining is whether the Service lost the right to pursue damages claims against CDC because the agency resold, or attempted to resell, the remaining timber on substantially different terms from those in the original contracts, and, if it did, whether any adjustment is necessary to damages for breach calculated under the contract formula.

## DISCUSSION

*Did Defendant Breach the Cow Contract?*

■ CDC argues that the government breached the Cow contract by refusing to

---

**2.** The combined adjustment for the fiscal changes (down payment and midpoint payment changes) was $6,146. The adjustment for cash on deposit and a 365 day year was $22,706. The total contract value at termination of the six contracts was $979,872. The fiscal adjustment thus represents less than one percent of contract value and just over three percent of the government's damage claim.

grant a second extension of CDC's performance period. The contract was originally scheduled to expire on March 31, 1985. By early 1985, CDC had completed the specified roads and had removed over 75 percent of the original estimated volume of 4,300 thousand board feet (MBF) of timber. It was unable, however, to remove the entire actual volume by the contract completion date. On CDC's request, the CO granted a one year extension, moving the completion date to March 31, 1986.

By the end of 1985, CDC had harvested more than 100 percent of the original estimated volume, although not all of the actual volume. It became clear that it could not complete the contract by March 31 of the following year. On July 23, 1985, the CO sent CDC a letter stating that the Cow contract would not qualify for a second extension. Nevertheless, on November 5, 1985, CDC did request a second extension. Burdette Chapel, a principal in CDC in charge of day-to-day operations in the timber division, testified that the company was ready, willing and able to perform. As of that time, CDC had already logged 108 percent of the total estimated volume of the sale. The Forest Service later estimated the uncut timber to be 792 MBF. On November 15, 1985, the CO denied CDC's request. Thereafter, CDC notified the CO that it was abandoning the contract.

Nothing in the language of the contract grants plaintiff a legal right to a first extension, much less a second one. The relevant contract provisions are found at C8.23 and C8.231. These provide that the CO "may" grant a time extension, but that "[t]his Subsection shall not obligate Forest Service to grant a contract term extension." In addition, an Interim Directive of the Service, dated June 27, 1984, directs that "Extensions of a contract term should be the exception rather than the rule." This addition to the Forest Service manual states that

> Contracting Officers are authorized to extend qualifying timber sale contracts 1 year. Except in unusual circumstances, only one extension shall be granted. Contracting Officers shall fully document reasons and justifications for any additional

extensions of time and shall submit them through channels to the Washington Office for review and authorization.

A number of factors are set out for the CO to consider in determining whether to grant an extension. These include completion of all contractually-required roads and harvesting of at least 75 percent of the timber. The agency granted CDC a first extension. The government thus cannot argue that the company did not meet the minimal requirements. The prerequisites to a second extension are basically the same as those for a first extension. CDC contends, and the defendant does not dispute, that the CO was thus *authorized* to recommend a second extension. *See* 36 C.F.R. § 223.115 (1986). The fact that the agency could have granted a second extension does not mean, however, it was in breach for not granting one. The irreducible fact remains that the decision to grant or withhold an extension is within the discretion of the agency.

■ Plaintiff is thus left with the argument that the Service's refusal to extend the contract was arbitrary and capricious and an abuse of discretion. CDC contends that such conduct is shown here because the Service routinely granted extensions and because of the agency's significant underestimate.

There is no question that there was a significant underestimate. The court is unwilling to hold that the refusal to grant a second extension was arbitrary based on that fact alone, however. Although the range of factors the CO is instructed to consider are the same for the first or second extension, the very fact that CDC had already received a single one-year extension becomes a new piece of data to consider. There is nothing irrational about taking into account that a second one-year extension doubles the amount of additional time beyond the original contract period or in considering the implications of an inability to complete within a first extension. The court thus cannot say that it was inappropriate for the new guidelines to draw a distinction between first and subsequent extensions, despite the asserted lack of any proof of hardship to the Service. To the extent that the overrun was a legitimate factor to consider, its continued punch is thus

considerably diminished by the grant of a first extension.

The second rationale is that extensions were routinely granted. Christine Anderson refused to agree with the assertion that extensions meeting the minimum requirements were routinely granted. One of plaintiff's experts, Paul Ehinger, however, testified that "they were granted" when criteria were met. A fair construction of his testimony is that extensions were routinely granted. Mr. Ehinger has considerable experience in the northwest timber business, and the court gives weight to his assessment. Nevertheless, there was no specific evidence at trial to the effect that *second* extensions were routinely granted. Moreover, as explained above, the court holds that the agency's differentiation in treatment between first and second extensions was both permissible and reasonable. Thus the fact that first extensions may have been routinely granted in the past does not make the decision not to grant a second extension arbitrary.

CDC also argues that it was improperly penalized by the application of the agency's internal guidance to contracting officers, which discouraged second extensions. Mr. Chapel testified that the CO, Mr. Schelhaas, indicated that, because of the new internal guidelines, he could not independently approve a second extension; it would require approval "in Washington." CDC argues that these guidelines, coming out after the contract was signed, improperly altered the contractual relationship between the parties.

We disagree. The right to ask for an extension is granted in the contract. The contract does not vest the right to receive an extension, however. The decision to grant or deny is left to the agency's discretion, subject only to a reasonableness standard. In implementing a purely discretionary function, the agency can provide guidance to employees authorized to exercise that discretion. And it can place restrictions, known only internally, in allocating the responsibility to make those decisions. CDC was not confronted with a moving target. It has not alleged that it was prejudiced by acting in reliance on preexisting guidelines. In short, so long as the decision-making process was not arbi-

trary or capricious, the precise means of reaching a conclusion internally did not have to be explained in advance to CDC.

Moreover, even if the agency improperly moved the final authority to grant or withhold an extension to the national headquarters, the error was without injury in this case. As Mr. Chapel testified, Mr. Schelhaas told him that he would not ask headquarters to approve a second extension because he did not think one was warranted.

The only defense offered by CDC to defendant's charge that the Cow contract was breached thus fails. Defendant is entitled to claim breach damages consistent with the terms of the contract.

*Appraisals*

■ As in *Seaboard*, the plaintiff challenged the appraisals as not being reflective of actual value and potentially affecting the resale prices. In addition, two contracts, Cougar and Short Flat, generated no resale bids. As to those contracts, apparently plaintiff's belief is that an inaccurate appraisal prejudiced it, as the amount it was credited would have been higher if a true fair-market-value appraisal had been conducted.

The government takes the position that a defaulting contractor benefits from the way the damages calculation operates in the event of no bid on attempted resale. According to Jerry Hofer, the lack of bids indicates that the fair market value of the remaining timber is less than advertised minimum rates. The minimum rates in effect artificially create a higher subtrahend for calculating damages than would be the case if actual fair market value were used. The factual premise behind plaintiff's primary challenge to the appraisals is thus a moot point.

The court will assume, in any event, that the plaintiff's factual premise is correct, i.e., that the methodology in place at the time of these resales did not generate a fair market value. Indeed, the methodology Hofer outlined was heavily criticized and has since been abandoned as not reflective of true fair market value. As we explained in *Seaboard*, however, the Federal Circuit has held, in the specific context of this type of timber contract, that the parties' contracted-for means

of measuring damages is enforceable. *Hoskins Lumber Co., Inc. v. United States*, 89 F.3d 816, 817 (Fed.Cir.1996) (Hoskins "was emphatically not entitled to a 'fair' appraisal, an 'accurate' appraisal, a 'reasonable' appraisal, or any manner of appraisal other than the one indicated in section B9.4"); *see Madigan v. Hobin Lumber Company*, 986 F.2d 1401 (Fed.Cir.1993). The contract here directs the Service to credit the defaulting contractor by using the then-standard appraisal method. That happened. The criticism that the method contracted for does not produce a fair market value figure is thus, according to the Federal Circuit, irrelevant.

Plaintiff argues, however, that the court in *Madigan* preserved common law contract principles as a potential bar to enforcement of the contract formula for calculating damages in the event of no resale. It points to the following language:

> [W]e conclude that the agreed upon contract term [C9.4], providing that the government is entitled to damages and providing the method of calculating those damages in the event that the government does not resell the timber, must be enforced in this case *in accordance with the general principles of contract law* and established precedent.

986 F.2d at 1405–06 (emphasis supplied). From this, plaintiff argues that the court left open the injured party's normal obligation to mitigate by avoiding unnecessary losses— i.e., to attempt to recover as much value as possible in the resale. That reading of *Madigan*, however, is completely at odds with the specific holding there, that the contract precluded the normal obligation to mitigate by resale. As the court makes clear, normal common law principles of mitigation do not apply, at least insofar as they are inconsistent with the specific provisions of the contract. This holding is fully consistent with its later statement that the contract must be enforced "in accordance with general principles of contract law," because, as it had already indicated by citing *Aragona Constr. Co. v. United States*, 165 Ct.Cl. 382, 1964

WL 8634 (1964), one of the general principles of contract law is that contracts are enforced according to their terms, even if the effect is to blunt what would otherwise be an obligation to mitigate.

The net result is thus the same as in *Seaboard*. The government was entitled to use the appraisal method it did, and, having generated appraisals, use them in either advertising for resales, or, in the event there were no resales, to assess damages.

### CDC's Axman Defense to the Counterclaim

■ The primary difference CDC points to is the increased cash down payment. CDC also contends that other differences— decreased terms in some resales, additional mid-point payment requirements, increases in essential reforestation or KV costs,[3] as well as changes in purchaser road credits, slash or brush disposal, state tax increases, and road maintenance deposits—affected the resale prices. Citing *United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914), it urges the court to disallow the counterclaim completely. Alternatively, it argues that these material differences cannot be quantified, and thus the government, which CDC contends has the burden of proof on this issue, collects nothing. This was supported in the *CDC* trial by Professor Douglas Rideout and Paul Ehinger, CDC's experts, who testified that the financial impact of the changes could not be determined. In *Seaboard*, they suggested that, if the court chose to attempt to quantify the impact of the new down payment requirement (there it was the full ten percent), it was at least twenty-five percent.

As to the contracts for which there were no bids in excess of advertised minimums, CDC argues that these same changes prejudiced plaintiff by skewing the bidding impulse downward. In the absence of these changes, bidders may have been willing to offer more, perhaps even more than the advertised value with which plaintiff was credited.

As to Bride and Short Flat, the two contracts on which there were no resales, the

---

3. KV refers to the Knutson–Vandenberg Act. Hence KV costs refer to the expense of planting trees to replace those felled by the contractor.

The Forest Service performs these tasks using funds set aside from the contractor's stumpage payments.

government asserts that *Axman* has no application, and that the contract formula applies without adjustment.

With respect to the other contracts, the government, in its current demand for damages, concedes the need to make an extra-contractual adjustment based on the down payment and midpoint payment changes with respect to contracts on which there was a resale. It recognized that these changes, although required by law, nevertheless impacted the resale receipts and thus that the amount of damages should be adjusted down accordingly. The regions were instructed to adjust for the amount of time that money paid, in effect, on deposit, would be in the Service's control without having been earned by harvesting. The contractor was credited with lost interest for the estimated period. The total adjustment on these six contracts for the fiscal changes was $6,146.00. No further allowances were made for any other differences, on the theory that they either had no impact or were attributable to the defaulting contractor. The government has not conceded that it is responsible for any of the other changes or that they are of any significance. It also contends that CDC bears the burden of proving the degree to which the changes prejudiced it.

At trial, the government changed its damage claim slightly. It offered evidence that the precise amount of credit allowed by the CO and Christine Anderson on the resold contracts was insufficient. Scott Olmstead, one of the government's experts with respect to adjusting the credit, calculated figures that were, overall, somewhat higher than the amounts already allowed by the Service. The ultimate range he endorsed as a further reduction in damages was a total of between $1,970.90 to $3,265.90 for the four resale contracts.[4]

The essential arguments, facts, and expert testimony in this case are the same as in *Seaboard*. In that decision, we denied the contractor's requested relief of entirely rejecting the deficiency counterclaim. The *Seaboard* opinion was based on evidence from both trials, including the testimony of all the experts. Instead we held that two changes—the imposition of a down payment requirement and the decrease in contract term—did impact the resale price. We also rejected the argument that increases in deposit or KV costs were "changes" within the reach of *Axman;* they merely reflect the serendipity of costs determined at a different point in time. The precise dollar differences in deposits and KV costs thus do not lead to a different analysis. The same is true of changes prompted by the passage of time, such as differences in volume of timber, increases in state taxes, or a different market for timber stumpage.

There are some differences between the facts and circumstances of the two cases, however. One legal difference, the switch to contract clause C9.4, has no bearing on the liability question. In addition, there are some factual differences. The down payment requirement in *CDC* merely increased in the resale; in *Seaboard* it was entirely novel. Some of the original *CDC* contracts, unlike the "What" contract in *Seaboard,* already had a midpoint payment. Two of the *CDC* contracts did not resell. The rest, like the What contract, did resell. There were, of course, other facts unique to each of the six attempted resales in *CDC,* for example, the percentage of timber cut and changes to the resale term. In addition, CDC points to the fact that there were changes in potential purchaser credits in Bride, Cougar, and Short Flat.

These differences in law and facts do not call for a different legal approach. We therefore adopt the legal analysis set forth in *Seaboard.* This means that the only relevant factors are the increase in down payment and the time allowed for harvesting. With respect to the former, in *Seaboard,* we assigned a ten percent value to the impact of the down payment requirement. In this case, the change was half as great, so we assign half the impact, or five percent. With respect to the four contracts which generated resales, the following subtractions are therefore made for the downpayment requirement from the government's counterclaim:

---

4. The Service had already allowed a reduction in damages of $2429.10 to reflect the impact of changes in down payment and midpoint payment on those four contracts.

Bride—$4,045; Cow—$3,484; Pearl—$14,779; Ram—$1,977.

The impact, if any, of changes in contract term are discussed below. Other factors argued by plaintiff—midpoint payment, deposits, KV costs, taxes, and others—we reject as grounds for an *Axman* analysis. We also agree with defendant that there is no factual basis for applying an *Axman* analysis in the two contracts which did not experience a resale.

### Changes in contract term on resale

There was a decrease in the term of five of the six resale attempts. In three of these contracts (Ram, Pearl, and Cow), there had been substantial harvesting, with the result that less timber was offered for resale. In one of the other two contracts in which the term was decreased, Bride, the total decrease was small, 44 to 43 months, and the same number of operating seasons was available. There was, however, a twenty percent drop in the number of operating months (from eighteen to fourteen and a half), despite the fact that the amount of timber to be cut was the same. As explained in *Seaboard*, the court is persuaded that decreasing the amount of operating months per unit of timber makes the resale contract less attractive. The difference in the case of Bride is more than twice the difference in the What contract. Accordingly, we assess a twenty percent impact on the resale bid. This means that the government's recovery in Bride should be reduced another twenty percent, or $16,178.

With respect to Short Flat, there was no bid. This alone would deter the court from attempting to assess any impact of a change in the offered resale term, but additionally, the six months decrease in contract term had no effect on the number of operating months.

### Resale costs

During the CDC trial, the court rejected the government's evidence as to resale costs, because they were supported only by the contracting officer's decision. (In *Seaboard*, independent proof of those costs was of-fered.) Accordingly, the court rejects the government's claim for resale costs.

### Interest

In one respect, the difference between contract Section B9.4 and C9.4 is material. That is with respect to interest. Section B9.4, applied in *Seaboard*, contains no specific interest provision. The court held there that the government had to rely on interest at common law, which is subject to considerations of equity. Under Section C9.4(4), however, applicable here, one element of damages for which the government is specifically entitled to seek recovery is its:

> loss caused by the delay in receipt of stumpage payments. Such loss will be measured by interest at the current rate being paid for borrowing by the United States (as calculated and published in the Treasury Department in TFRM 6–8020–20) on the unpaid contract value at Termination Date. Interest will be charged for the total number of months, or portions thereof, from Termination Date, until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale.

None of the resale dates exceeded one year from the date of termination. The principal on which interest is charged is the unpaid contract balance, not the net amount after offsets for either resold timber, or, in the case of no resale, for the minimum bid amount. As explained above, however, the Service credited against contract balance any cash on deposit.[5]

It is also noteworthy that, at the time of the claim demand, March 20, 1987, the interest component in part represented a claim for delay into the future. This is because, in all cases, the midpoint of the resale contracts—the outer limit for assessing interest under the contract—had not arrived.

If the defaulted contract is offered for resale, interest is charged through the midpoint of the proposed resale, even if there are no bids. The government still collects interest because the fact that there were no

---

5. Although the question does not arise in these six contracts, the court is of the view that effective purchaser credits act like cash *within a* *particular contract.* In other words, if there had been effective purchaser credits, they would be applied before determining interest.

bids was not the result of government action. If the contract is not offered for resale at all, no interest accrues under C9.4(4).

The contract thus includes a mechanism for estimating loss due to delay in receipt of stumpage payments. Plaintiff argues that there is no loss shown because, in fact, payments may have been received late in the term of the prior contracts [6] or, in the case of Bride, there was mitigation because the entire purchase price was recovered prior to the midpoint of the resale. These arguments are off the point. The contract interest clause is a "one-size-fits-all" device for estimating lost interest. Plaintiff agreed to it. The fact that in a particular case it overestimates the loss is immaterial. The clause does not require proof of actual loss. It follows that CDC's offer to escrow the claimed amounts to avert interest is no defense. The Service was not obligated to accept that offer in lieu of contract interest, and, in any event, CDC could have escrowed the amount on its own.

Plaintiff also questioned the additional interest that accrues when the resale is for a longer term, either in absolute terms, as in the case of Cougar, or in relative terms, as for example, Pearl, where two thirds of the time was allocated to harvest forty-five percent of the original volume in the Pearl sale. As to Pearl, the court finds the difference, insofar as the record stands, to be reasonable. The Service was faced with a choice of going from the original three operating seasons to either one or two. If it had gone to only one season, instead of two, which it chose to do, plaintiff might have complained that the resale contract would be unattractive to bidders. Under the circumstances, the decision to offer the resale over two seasons was reasonable.

As to Cougar, however, the evidence is different. There was no performance. The same timber was offered. Christine Anderson characterized the Cougar original three-year term as reasonable, but she described the four-year resale term as "very

generous." When asked to account for the increase, she was unable to do so. Under these circumstances, the plaintiff has raised a significant question as to the rationale for an increase. In the absence of an explanation, the court finds the additional year to be unreasonable. It follows that six months of that period would not earn contract interest. This becomes a moot point in the precise circumstances of the Cougar contract, however, in view of the court's holding below limiting the running of contract interest prior to the date the claim matured.

There is one other legal difference between the contracts with respect to interest. The contract in Seaboard pre-dated the Debt Collection Act, 31 U.S.C. § 3717 (1994). The act became effective in October 1982 and thus applies to the contracts in this proceeding. Under the act, interest begins to run immediately upon the due date, at rates published by the Treasury in TFRM 6 in the Federal Register. Payment as to all contracts was demanded on March 20, 1987, to be paid within fifteen days, i.e., by April 4, 1987. The rate in effect with respect to the Debt Collection Act for the calendar year 1987, was 7%. 51 Fed.Reg. 42673. The government thus seeks, as a separate component of a judgment, statutory interest on the entire debt.

■■■ With respect to the claim for statutory interest, due to the fact that the government "claim" matured on April 4, 1987, interest under the act would appear to run from that date. The court has one reservation, however. As to some contracts, the date statutory interest begins running is prior to the midpoint of the resale contracts. As to these contracts, the government's position, if correct, would have the effect of two different interests accruing simultaneously on the same principal. The purpose of the act was to ensure that the government did not lose the benefit of the use of monies owed to it by contractors, see S.Rep. No. 97–378 at 3, reprinted in 1983 U.S.C.C.A.N. 3377, 3379. Under these circumstances, the purposes of

---

6. Moreover, four of the original contracts already had midpoint payment requirements. Bride, Cougar, and Short Flat were terminated for failure to make the midpoint payments. Even if the

contractor chose to delay harvesting, in other words, the Service was incurring a "delay in the receipt of stumpage payments."

both the act and the contract are satisfied if statutory interest begins to accrue on April 4, 1987, on the entire claim, including contract interest accrued up to that point. Accordingly, contract interest on the various claims runs from the date of termination until April 4, 1987, as follows: Bride, Cougar and Short Flat—442 days; Cow—464 days; Pearl and Ram—369 days.

## CONCLUSION

In sum, the government is entitled to recover on its counterclaim in the following amounts:

|  | Bride | Cougar | Cow | Pearl | Ram | Short Flat | Total |
|---|---|---|---|---|---|---|---|
| Contract Value | $72,800 | $221,360 | $127,594 | $339,148 | $57,360 | $161,612 | $979,873 |
| Resale Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| KV Costs | 0 | $ 53,286 | 0 | 0 | . 0 | $ 28,491 | $ 81,777 |
| C9.4 Interest | $ 6,694 | $ 20,369 | $ 9,915 | $ 21,743 | $ 4,143 | $ 14,775 | $ 77,639 |
| Less Resale or appraisal | $72,800 | $274,672 | $ 62,714 | $266,023 | $35,575 | $190,088 | $901,872 |
| Less adjust. | $20,223 | 0 | $ 3,484 | $ 14,779 | $ 1,977 | 0 | $ 40,463 |
| Less cash | $ 3,700 | $ 11,100 | $ 40,932 | $ 70,305 | $ 6131 | $ 9,100 | $141,268 |

Total: $ 55,686

Accordingly, the Clerk is directed to enter judgment for the United States in the amount of $55,686, plus interest pursuant to the Debt Collection Act on that amount from April 4, 1987. Each side to bear its own costs.