**VINEGAR HILL ZINC COMPANY,**
a Corporation

v.

**UNITED STATES.**
No. 342–56.

United States Court of Claims.
April 6, 1960.

Alexander M. Heron, Washington, D. C., for plaintiff. Pope, Ballard & Loos, Washington, D. C., and Kopp & McKichan, Platteville, Wis., were on the briefs.

David V. Anthony, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant, Earl L. Huntington, Washington, D. C., was on the brief.

MADDEN, Judge.

The plaintiff sues the United States for breach of contract. It alleges that the Government agreed to purchase certain zinc to be produced by the plaintiff, but refused to accept or pay for the zinc.

The contract here in suit was at first evidenced by a "letter of intent" written to the plaintiff by the Government's Administrator of General Services on June 30, 1951. The contract was for the production by the plaintiff and the purchase by the Government of zinc. It provided that the production and sale should commence upon the completion by the plaintiff of the opening of the contemplated mine, which preparatory work was to be accomplished within one year from the June 30, 1951 date. The contract was to continue for three years from that date, that is, for two years after the completion of the preparatory work. The time might be extended if performance was interfered with by a *force majeure*, but in no event was it to be extended beyond August 31, 1955.

The contract specified the terms on which the Government was to purchase zinc from the plaintiff. The Government was to have the right to purchase at least 50 percent of the plaintiff's monthly production, not exceeding 105 short tons of slab zinc per month, at a price fixed in the contract. The plaintiff could sell its production in the open market, to the extent that the Government did not exercise its right to purchase. But the Government was required by the contract to purchase all of the plaintiff's production which the plaintiff did not choose to sell in the open market, up to a maximum amount of 5,000 short tons of zinc.

Under this contract, if the market price was less than the price at which the Government had agreed to buy the zinc, the plaintiff would of course sell all of its production, up to the monthly and the total maximum limits, to the Government at the contract price.

The letter of intent was superseded by a formal contract, dated December 15, 1952. The letter of intent had said that during the existence of *force majeure* conditions the plaintiff would not be required to make deliveries under the contract, and its time for performance would be extended accordingly, but not beyond August 31, 1955. The definitive contract contained Article XIX entitled Force Majeure. But the contents of the paragraph included more than what is traditionally meant by *force majeure*. The paragraph said:

"If the performance of any part of this Contract by either the Contractor or the Government is prevented, hindered or delayed by reason of any cause or causes beyond the respective control of the Contractor or the Government, and which cannot be overcome by due diligence, then the Contractor or the Government, as the case may be, shall be excused from such performance during the continuance of any such happenings or events. To become operative, the Contractor or Government, as the case may be, shall give to the other, within ten (10) days after the occurrence of such happenings or events, written notice thereof, together with a statement setting forth the facts in evidence, and, upon the conclusion of such happenings or events, shall notify the other in writing of such termination within ten (10) days."

The plaintiff in sinking its shaft and doing its underground development work, encountered soft and broken ground and was delayed in getting its mine in operation. It was supposed to get it in operation within a year after June 30, 1951. On October 2, 1952, the plaintiff asked for a three months' extension of its

contract, which extension was granted. That extension postponed the contract completion date to September 30, 1954.

While negotiations for the contract were going on, before the letter of intent was issued, the plaintiff had submitted to the Government a proposal, together with an analysis of exploratory test drilling which the plaintiff had done to determine whether and how much zinc could be expected at the location contemplated for the mine. This test drilling showed an expected zinc ore content of 6.30% and a lead ore content of 0.22%.

The plaintiff began its mining operation. The yield of zinc from the ore was only 3.37%, or about half as much as the parties had anticipated. Because of the low yield of the ore, the plaintiff's production of slab zinc was much lower than it would have been if the ore had been as rich as the test drillings had indicated. On April 22, 1954 the plaintiff applied for an extension of one year to enable it to produce the 5,000 tons of zinc specified in the contract. It said that it had encountered conditions beyond its control, specifying the low yield of the ore, and the difficulties which it had encountered in sinking its shaft and opening its mine.

Article XIX of the definitive contract, entitled "Force Majeure", and hereinbefore quoted, required the party claiming an extension of time on account of causes beyond its control to give notice in writing within ten days of the occurrence of the event relied upon as a justification for the extension. The plaintiff's April 22, 1954, request for an extension of one year was not answered by the Government until October 6, 1954. On that date the Government said that notwithstanding the 10-day notice requirement, the plaintiff's time would be extended from September 30 to October 30, 1954, and that the plaintiff should, before October 30, submit a detailed report on the basis of which the Government could determine whether any further extension was justified. The plaintiff submitted the requested report on October 11. On October 19, the Government's agent with power to act in that regard, denied any extension beyond October 30, on the ground that the difficulties encountered by the plaintiff had been normal business risks, and had not been causes for extension of time within the meaning of Article XIX of the contract.

The plaintiff appealed to the General Services Administration Board of Review, which Board determined that all of the plaintiff's asserted causes of delay were beyond the control of the plaintiff, but recommended rejection of the plaintiff's claim on the ground that the plaintiff had not given the 10-day notice required by Article XIX. The Board's recommendation was adopted by the Administrator of the General Services Administration who, however, extended the plaintiff's contract time to November 30, because he had not completed consideration of the plaintiff's claim until about that date.

The plaintiff commenced the closing of the mine about December 1, 1954, and completed the closing during February 1955. The closing consisted of withdrawing from the areas farthest from the shaft, removing the pillars of ore which had been left unmined in order to support the roof of the mine. This withdrawal and the ore obtained from it produced 121.8 tons of zinc in December 1954 and 235 tons in January and February, 1955. If the Government had accepted and paid for this production, the plaintiff would have received $35,153.23 more than the market price of zinc during those months. This suit is for the $35,153.23.

Whether the plaintiff has a right to recover depends upon whether it was, under its contract, entitled to a greater extension of time for performance than the extension which it actually received.

The so-entitled "Force Majeure" article of the contract was very broad. It excused performance during the time the work was delayed

"* * * by reason of any cause or causes beyond the respective control of the Contractor or the Govern-

ment * * *, and which cannot be overcome by due diligence * * *."

This language comprehends much more than does the legal concept of *force majeure*, and much more than does the usual language in Government contracts about "unforeseen conditions of an unusual nature."

▆ The purpose of the instant contract was to induce the plaintiff to produce, from a newly opened source, a metal much needed by industry and the Government. If the plaintiff was not lacking in diligence, it was to have the opportunity to produce 5,000 tons of the metal, if it could do so before the ultimate cutoff date of August 31, 1955, and to sell the 5,000 tons to the Government at a guaranteed price.

The plaintiff was not lacking in diligence. It is not claiming that it had the right to go on producing until August 31, 1955, but only until some time in February 1955. It is not claiming that it had the right to sell the Government 5,000 tons of zinc, but only the 3,424.6 tons which it actually produced.

We think the language of Article XIX of the contract, fairly interpreted, applies to the situation in which the grade of ore turned out to be far below the expectation of the parties when they entered into the contract. That situation was the principal cause of the impossibility of producing the contemplated 5,000 tons of zinc. The General Services Administration Board of Review, and the Administrator himself, were of this opinion. They denied the requested extension, but on the ground that the plaintiff had not given the 10-day notice stipulated in Article XIX.

▆ As to the 10-day notice, the Government's representatives knew when the contract was made what yield was expected from the ore in the projected mine. They knew that if the yield was only a fraction of that expected, it would take much more time to produce the contemplated amount of zinc. Reports by Government inspectors in December 1952, and in several months in 1953

showed that the ore was of low grade. For the plaintiff to have written to these representatives informing them that the ore was unexpectedly low in grade, and that it would, therefore, take longer than had been expected to produce the contemplated amount of zinc, would have been telling them what they already knew, what they couldn't have done anything about, and would have been an empty gesture.

However, on April 22, 1954, the plaintiff did expressly request an extension of one year, giving the low grade of ore as one of two grounds. At that time there still remained more than five months of performance time, and the 10-day notice requirement was expressly complied with as to that period. Applying the rate of slow-down in production caused by the low grade of ore to those five months alone, the plaintiff would have been entitled to the less than three-months' extension which it seeks. We also conclude, however, as indicated above, that the 10-day notice requirement had no application to the problem of the low grade of ore.

The plaintiff is entitled to a judgment for $35,153.23.

It is so ordered.

JONES, Chief Judge, LITTLETON, (Retired), and LARAMORE, Judges, concur.

WHITAKER, Judge (dissenting).

I cannot agree with the decision of the majority.

Article XIX of the contract does not say that in the event of a condition beyond plaintiff's control, the time for performance of the contract would be extended. The article merely says that such a condition will excuse performance. The contract completion date was September 30, 1954. The Government is under no obligation to further extend the time or to pay for zinc mined after that date.

The Government made no representation to plaintiff with respect to the zinc content of the ore to be extracted from

the mine. The Government made no borings to ascertain the zinc content. The borings were made by plaintiff. Certainly the Government is not in anyway obligated, either legally or equitably, to relieve plaintiff from the consequences of its reliance upon the indications obtained from its own exploration.

I would dismiss the plaintiff's petition.