**SEABOARD LUMBER COMPANY and Capital Development Company, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

Nos. 01–5097, 01–5124.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 18, 2002.

resulting from the respective failures of each of the companies to perform on different timber sales contracts. *Seaboard Lumber Co. v. United States,* 48 Fed. Cl. 814 (2001) (*"Seaboard II"*); *Capital Dev. Co. v. United States,* 49 Fed. Cl. 178 (2001). Seaboard also appeals from the rejection as a matter of law of its non-performance defenses of force majeure, impossibility of performance, commercial impracticability and frustration of purpose. *Seaboard Lumber Co. v. United States,* 41 Fed.Cl. 401 (1998) (*"Seaboard I"*). Because the Court of Federal Claims did not err in its conclusions of law, and its findings of fact on damages are not clearly erroneous, we affirm.

Andrew R. Gala, Schwabe, Williamson & Wyatt, P.C., of Seattle, WA, argued for plaintiffs-appellants. With him on the brief was William F. Lenihan. Of counsel was Steven A. Miller.

Richard P. Nockett, Attorney, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; John W. Showalter, Assistant Director, and John Warshawsky, Attorney. Of counsel on the brief was Lori Polin Jones, Attorney, Office of the General Counsel, Department of Agriculture, of Washington, DC.

Before NEWMAN, SCHALL, and LINN, Circuit Judges.

LINN, Circuit Judge.

Seaboard Lumber Co. ("Seaboard") and Capital Development Co. ("CDC") jointly appeal from decisions of the United States Court of Federal Claims assessing liability and awarding damages to the government

## I. BACKGROUND

### A. The Timber Contracts

At issue in this appeal are one timber sale contract, designated the "What" contract, between Seaboard and the Forest Service, and six timber sale contracts, designated the "Bride," "Pearl," "Ram," "Cougar," "Short Flat," and "Cow" contracts, between CDC and the Forest Service. Seaboard disputes both liability and damages resulting from its breach of the What contract. CDC disputes both liability and damages resulting from its breach of the Cow contract. CDC concedes liability but disputes damages resulting from its breach of the Bride, Pearl, Ram, Cougar, and Short Flat contracts.

### 1. The What Contract

In September 1980, Seaboard entered into the What contract—a fixed price contract to harvest timber. At that time, there was a housing boom and the price of timber was high. The contract required Seaboard, by the contract termination date of March 31, 1983, to cut, remove, and pay for all of the timber on the What parcel.

Between 1981 and 1983, the government allowed interest rates to rise in order to combat inflation, and at least in part because of the rise in interest rates, the housing and lumber markets softened. Many contractors ran into financial difficulties. The timber in all of the parcels at issue in this appeal was of sufficient quality to harvest, and the contractors had the opportunity to conduct a harvest if they so desired. Some logging contractors performed on their timber contracts during this period. Others did not.

In April 1983, the Forest Service allowed Seaboard a two-year extension of the contract term under the agency's SOFT II extension policy, which allowed contract extensions due to then-depressed markets for forest products. The What contract expired, uncompleted, on December 28, 1985.

The What contract contained a damages provision, Provision B9.4, which stated, in pertinent part, that:

> Damages due the United States for Purchaser's failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value plus the cost of resale, less any effective Purchase Credit remaining at the time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit.

In 1984, Congress enacted the Federal Timber Contract Payment Modification Act, which stated that, effective 1985, "in any contract for sale of timber from the National Forests, the Secretary of Agriculture shall require a cash down-payment at the time the contract is executed and peri-odic payments to be made over the remaining time of the contract." 16 U.S.C. § 618(d) (2000). The purported goal of these new financial requirements was to deter speculative bidding.

In 1987, the Forest Service resold the What contract. Pursuant to 16 U.S.C. § 618, the resale contract incorporated both a down payment requirement (10 percent of advertised resale plus a 20 percent bid premium) and a midpoint payment requirement (25 percent of the total contract value) that equaled $61,800 and $149,000, respectively. The original What contract contained neither financial requirement. In addition, the resale contract sold less timber than the original, 5,900 MBF [1] as opposed to the original 6,300 MBF, and contained a shorter logging period, 9.5 months of normal operating season as opposed to the original 18.5 months.

There were three bidders on the What resale, one fewer than on the original contract. The contract was resold for less than the then-current contract value of the remaining timber plus the cost of resale. Pursuant to the governing damages provision, the Forest Service's contracting officer demanded the difference. The government subsequently reduced the requested damage amount to reflect what it estimated to be the effect of the down payment and midpoint payment requirements in reducing the resale price.

### 2. The Cow Contract

On April 15, 1983, CDC and the Forest Service entered into the Cow contract. The contract required CDC to cut, remove, and pay for all of the timber included in the sale by the contract termination date of March 31, 1985. By early 1985, CDC had removed over 75 percent of the original estimated volume of 4,300 MBF. CDC

---

1. MBF is a unit of measure equal to one thousand board feet of timber.

sought and the Forest Service granted a one-year extension pursuant to Special Provisions C8.23 & C8.231.[2] In July 1985, the contracting officer sent CDC a letter stating that the Cow contract "will not qualify for any further extensions." Nevertheless, CDC requested a second one-year extension. The Forest Service denied this request. CDC abandoned the contract on December 26, 1985 after harvesting an amount of timber that was in excess of 100% of the original estimated volume but was not all of the timber in the Cow parcel.

The Cow contract, like CDC's other contracts, contained Provision C9.4, which provides, in pertinent part:

Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between the Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs:

(1) The cost of resale or reoffering;

(2) Any increase in Purchaser Credit Limit allowance for unconstructed Specified Road facilities which are needed to harvest the remaining uncut volume....;

....

(4) The Government's loss caused by the delay in receipt of stumpage payments. Such loss will be measured by interest

at the current rate being paid for borrowing by the United States (as published or calculated by the Treasury Department in TFRM 6–8020–20) on the unpaid contract value at Termination Date. Interest will be charged for the total number of months, or portions thereof from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale;

(5) Any increase in reforestation costs....

In August 1986, the Forest Service resold the Cow contract. The resale contract differed from CDC's original contract in several respects.

First, the original contract included an estimated 4,300 MBF of timber, while the resale included less, an estimate of only 792 MBF, due to CDC's partial performance. The resale provided one and one-half operating seasons for logging, while the original contract, as extended to March 31, 1986, provided three operating seasons in which to log. In addition, the resale contract required a 10 percent down payment of $6,300, while the original contract required only a 5 percent down payment of $27,500. Furthermore, the resale contract required a midpoint payment in the amount of $15,874.51, while the original contract did not require a midpoint payment.

The resale contract sold for less than the then-current value of the remaining timber volume, plus cost of resale. Pursuant to Provision C9.4, the Forest Service's contracting officer demanded the difference with interest as damages. The amount was $82,916.

---

**2.** Provision C8.23 states that "[t]his Subsection shall not obligate Forest Service to grant Contract Term Extension." Provision C8.231 states that the "Forest Service may grant Purchaser's written request for Contract Term Extension if all of the following conditions have been met...."

### 3. The Bride Contract

The Bride resale contract differed in requiring a 10 percent down payment of $7,300, while the original contract required only 5 percent, an increase of $3,700. The resale contract required a midpoint payment in the amount of $27,853, while the original contract required a midpoint payment in the amount of $18,200, an increase of $9,653.

There was one bidder on the Bride Resale. It sold for less than the then-current value of the remaining timber volume plus the cost of resale. Pursuant to Provision C9.4, the Forest Service's contracting officer demanded $15,549.78 in damages.

### 4. The Pearl Contract

The Pearl resale contract differed from the original contract in several respects. First, the original sale included an estimated 5,400 MBF of timber, while the resale included less, an estimated 2,497 MBF. Second, the original contract provided three operating seasons for logging operations, while the resale contract provided two operating seasons. This period was two-thirds of the operating season time allowed to harvest 46 percent of the timber estimated to be in the original sale. In addition, the resale contract required a 10 percent down payment of $26,700, while the original contract required only a 5 percent down payment of $34,700. Further, the resale contract required a midpoint payment in the amount of $66,505.81, which was based on 25 percent of the estimated sale value, while the original contract required a larger midpoint payment, in the amount of $301,968, which was 50 percent of CDC's bid premium.

There were three bidders on the Pearl Resale. It sold for less than the then-current value of the remaining timber volume plus the cost of resale. Pursuant to Provision C9.4, the Forest Service's con-

tracting officer demanded the difference with interest as damages. The amount demanded was $125,556.71.

### 5. The Ram Contract

The Ram resale contract differed from the original contract in several ways. The original sale included an estimated 2,100 MBF of timber, while the resale included less, an estimated 530 MBF, as a result of CDC's partial performance. The original contract provided three operating seasons for logging operations, while the resale contract provided only a single operating season. The resale contract provided for a 10 percent down payment of $3,600, while the original contract required a 5 percent down payment of $9,800. The resale contract required a midpoint payment in the amount of $11,534.48, while the original contract did not require a midpoint payment.

There were three bidders on the Ram resale. It sold for less than the then-current value of the remaining timber volume plus the cost of resale. Pursuant to Provision C9.4, the Forest Service's contracting officer demanded the difference with interest as damages. The amount demanded was $29,935.71.

### 6. The Cougar and Short Flat Contracts

The Cougar and Short Flat contracts were advertised but not resold. The appraised value of the remaining timber on both contracts was less than the then-current value of remaining timber volume at the default date. Pursuant to Provision C9.4, the contracting officer demanded damages. Included in the damage demands were resale costs, reforestation costs, and interest. At the time, the amounts requested on the Cougar and Short Flat contracts were $51,830.75 and $24,785.86, respectively.

The government subsequently made several changes to its damage demands. In the aggregate, factoring in what it believed was the effect of the down payment and midpoint payment requirements on damages, the government demanded $160,454.12 on all six CDC contracts.

### B. Procedural History .

Seaboard and CDC initially brought suit in the Court of Federal Claims under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (2000), in June 1988 and December 1987 respectively, separately seeking a declaratory judgment of no liability and/or a bar on damages. In both cases, the government counterclaimed for damages. The Court of Federal Claims consolidated CDC's suit with other pending timber contract cases in April 1988. Seaboard's case was consolidated in August 1988. Seaboard and CDC's actions are two of twenty-six timber contract cases consolidated in two groups in the Court of Federal Claims. *Seaboard Lumber Co. v. United States,* Nos. 610–84C, *et al.* (eighteen cases); and *Manke Lumber Co. v. United States,* Nos. 33–85C, *et al.* (eight cases).

In its case, Seaboard conceded non-performance. Seaboard argued, however, that its non-performance should be excused because of a force majeure clause in the What contract and because of the doctrines of impossibility of performance, commercial impracticability, and frustration of purpose. The Court of Federal Claims denied Seaboard summary judgment on these four issues, disposing of these arguments "as a matter of law." *Seaboard I,* 41 Fed.Cl. at 405, 421. Seaboard's case went to trial on the issue of damages.

In its case, CDC conceded liability on the Bride, Pearl, Ram, Cougar, and Short Flat contracts but denied liability on the Cow contract. CDC alleged that the Forest Service first breached the Cow contract by abusing its discretion in not granting CDC a second term extension for which it was eligible. Following a bench trial, the Court of Federal Claims held that CDC was liable for breach of the Cow contract. *Capital Dev.,* 49 Fed.Cl. at 181–82.

In their respective trials, Seaboard and CDC argued that the changed terms in the resale contracts caused the resale contracts to differ materially from the original contracts and thus completely barred the government's damage claims under the rule set forth in *United States v. Axman,* 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914). Alternatively, Seaboard and CDC argued that the government could not meet its burden of proving damages because it could not precisely quantify the effects of the changed terms on the resale prices. The Court of Federal Claims held that the changes in contract terms did not substantially alter the character of the work, and thus the government's damage claims were not barred under *Axman. Seaboard II,* 48 Fed.Cl. at 822. Although it found that "the degree of impact of government-caused changes [could not] be measured with precision," the Court of Federal Claims on the damages claims held that the government made out a prima facie case that appellants failed to rebut. *Id.* at 835. The Court of Federal Claims then adjusted damages owed on Seaboard's contract to $350,154.29 plus interest, *id.* at 837, and those owed on CDC's six contracts to $52,710 plus interest, *Seaboard Lumber Co. v. United States,* No. 750–87C (Fed.Cl. May 22, 2001).

On appeal, Seaboard seeks review of the Court of Federal Claims' rejection, as a matter of law, of its non-performance defenses of force majeure, impossibility of performance, impracticability of perfor-

mance, and frustration of purpose. CDC seeks review of the finding that the Forest Service did not abuse its discretion by not granting it a second term extension on the Cow contract. Appellants both seek review of the Court of Federal Claims' determination that *Axman* does not bar the government's damage claims and that the contractors bear the burden of rebutting the government's evidence of damages once the government has made out a prima facie case. Appellants also seek review of the Court of Federal Claims' factual findings that the government made out a prima facie case on damages and that they did not sufficiently rebut the government's evidence. In addition, appellants argue that the court's adjustments to the requested damage awards were clearly erroneous.

## II. DISCUSSION

### A. Standard of Review

 In reviewing decisions of the Court of Federal Claims, this court conducts de novo review of issues of law such as contract interpretation. *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed.Cir.2001). Findings of fact made by the Court of Federal Claims, however, are reviewed under the "clearly erroneous" standard. *Id.*

 Whether performance is factually impossible or commercially impracticable is a question of fact, not of law. However, the ultimate issue is one of law. *Blount Bros. Corp. v. United States*, 872 F.2d 1003, 1006–07 (Fed.Cir.1989) (citing *Koppers Co. v. United States*, 186 Ct.Cl. 142, 405 F.2d 554, 558–59 (1968)).

 A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

 The grant or denial of summary judgment on a question of law is subject to de novo review. *Jay v. Sec'y of the Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.1993). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Analysis

#### 1. Liability

Seaboard argues that the Court of Federal Claims erred in rejecting its nonperformance defenses of force majeure, impossibility of performance, impracticability, and frustration of purpose. CDC argues that the court erred in finding at trial that the contracting officer did not abuse his discretion in not granting CDC a second contract term extension, and that CDC was thus liable for breach of the Cow contract.

##### a. Force Majeure

Provision B8.21 of Seaboard's contract is a force majeure clause. It states, in pertinent part, that a contractor qualifies for a contract term adjustment where the:

[contractor] experiences delay in starting scheduled operations or interruption in active operations either of which stops removal of Included Timber from Sale Area through curtailment in felling and buckling, yarding, skidding and loading, hauling or road construction, as scheduled under B6.31, for 10 or more consecutive calendar days during a Normal Operating Season due to causes beyond Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

Seaboard argues that there were a number of distinct "acts of government" that occurred in the early 1980's, e.g., new monetary control procedures and the deregulation of savings institutions, which led to an increase in interest rates and a slump in the timber market. Seaboard asserts that, because the weakness in the timber market was beyond its control and prevented it from harvesting timber, the Forest Service was obligated to grant Seaboard a term adjustment. Because the Forest Service refused, Seaboard argues that the Service breached the contract, relieving Seaboard of liability. The Court of Federal Claims rejected this defense as a matter of law. We affirm the holding of the court.

First, as the Court of Federal Claims recognized, the contract required Seaboard to request a term adjustment at least ten calendar days before the termination of the contract term. Seaboard made no such request. Even if Seaboard had made a timely request for an adjustment, however, the Forest Service was under no contractual obligation to grant it.

█ We find no case in this court or its predecessor holding that the phrase "acts of Government" in a force majeure clause is so broad as to include government fiscal or monetary policy decisions. Such acts have only an attenuated effect on the contracts at issue, at most making performance by the timber contractors unprofitable. We hold that the phrase "acts of Government" in the context of Provision B8.21 does not cover such acts.

█ Our sister circuits have held that government policies that affect the profitability of a contract but do not preclude performance should not be considered "acts of government" for force majeure clause purposes. See, e.g., Langham–Hill Petroleum, Inc. v. S. Fuels Co., 813 F.2d 1327 (4th Cir.1987) (rejecting claim for relief under force majeure where the govern-

ment of Saudi Arabia acted to cause a collapse in world oil prices, making a contract unprofitable for one party); N. Ind. Pub. Serv. Co. v. Carbon County Coal Co., 799 F.2d 265 (7th Cir.1986) (holding that a government order denying a request from a utility to pass increased coal prices along to its customers did not excuse utility from a long-term contract to buy coal even though contract was unprofitable). "A force majeure clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed-price contract is that the market price will change." N. Ind. Pub. Serv. Co., 799 F.2d at 275.

Seaboard directs our attention to Vinegar Hill Zinc Co. v. United States, 149 Ct.Cl. 494, 276 F.2d 13 (1960) and Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957 (5th Cir.1976). These cases do not support Seaboard's position. In Vinegar Hill Zinc, the grade of ore from a zinc mine specified in a contract proved to be far below the expectations of the parties. This was beyond the control of the contractor and occurred despite the contractor's diligence. The Court of Claims held that a force majeure clause in the contract entitled the contractor to an extension of time in which to perform. Vinegar Hill Zinc, 276 F.2d at 14–16. Seaboard makes no analogous claim that the quality of the timber did not meet each party's expectations. In fact, it admits that the timber was of sufficient quality. In Eastern Air Lines, there were delays in the delivery of aircraft to Eastern Air Lines as a result of government priority orders during the Vietnam War. The Fifth Circuit held that an "excusable delay" clause that provided that McDonnell Douglas would not be responsible for delays due to, inter alia, "any act of government, governmental priorities, allocation regulations or orders affecting materials, equipment,

facilities or completed aircraft" excused McDonnell Douglas from liability for the delays in delivery. *Eastern Air Lines*, 532 F.2d at 988, 996. In contrast, Seaboard has not directed our attention to any contractual language specifying that the monetary measures taken by the government are to be understood as "acts of government" for the purposes of the force majeure clause. Nor has Seaboard shown that the government ordered it to harvest some other timber, thus tying up capacity and precluding it from performing on the What contract.

Seaboard entered into a fixed-price contract with the Forest Service. The contract allowed for term adjustment if acts of government prevented removal of timber. At most, the government's acts indirectly made performance of the What contract unprofitable. The timber was of sufficient quality, and Seaboard simply made a business decision not to harvest. Timber prices fell and Seaboard must bear this market risk in the absence of contractual language that directs otherwise. For these reasons, the Court of Federal Claims did not err in holding that Seaboard's force majeure defense fails as a matter of law.

### b. Impossibility and Commercial Impracticability

■■■ Seaboard argues that the slump in the timber market made its performance impossible or in the alternative commercially impracticable, thus excusing its nonperformance. Performance is only excused under this doctrine when it is objectively impossible. *Jennie–O Foods, Inc. v. United States*, 217 Ct.Cl. 314, 580 F.2d 400, 409 (Ct.Cl.1978). It is thus not enough for Seaboard to show that it was incapable of performing on the contract; it must show that no similarly-situated contractor could have performed. The mar-

ket fluctuation did not make Seaboard's contract impossible to perform, only unprofitable. Other contractors performed on logging contracts during the same period. Therefore, Seaboard's performance was not objectively impossible and cannot be excused on that basis.

■■■ This court and its predecessor have long recognized that the doctrine of impossibility does not require a showing of actual or literal impossibility of performance but only a showing of commercial impracticability. *Id.* at 408; *Hercules Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir.1994) (noting that the doctrine of impossibility of performance "excuses delay or nonperformance of a contract where the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed"); *Natus Corp. v. United States*, 178 Ct.Cl. 1, 371 F.2d 450, 456 (1967). The Supreme Court has reformulated the common law doctrine of impossibility as follows:

> [W]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*United States v. Winstar Corp.*, 518 U.S. 839, 904, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (quoting Restatement (Second) of Contracts § 261). This defense requires Seaboard to show that (i) a supervening event made performance impracticable; (ii) the non-occurrence of the event was a basic assumption upon which the contract was based; (iii) the occurrence of the event was not Seaboard's fault; and (iv) Seaboard did not assume the risk of occur-

rence. *See Winstar Corp.,* 518 U.S. at 904–10, 116 S.Ct. 2432.

■ Even if we assume without deciding that Seaboard's performance is impracticable because it would bankrupt the company, Seaboard must show that the non-occurrence of a slump in the timber market was a basic assumption of the What contract. *See id.* at 905, 116 S.Ct. 2432. "[I]f [the risk] was foreseeable there should have been a provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." *Id.* (quoting *Lloyd v. Murphy,* 25 Cal.2d 48, 153 P.2d 47, 50 (1944)). In *Winstar Corp.,* the contracts at issue provided that the government would give certain regulatory treatment with regard to capital reserve requirements to parties who purchased failed thrifts. The Supreme Court held that the government's substantive performance in the contracts—the favorable regulatory treatment—implied that the regulatory environment might change and, "*a fortiori,* allocate[d] the risk of regulatory change" to the government. *Winstar Corp.,* 518 U.S. at 906, 116 S.Ct. 2432. The Supreme Court also found that the statutes and regulations governing capital requirements had in fact changed numerous times. *Id.* at 906–07, 116 S.Ct. 2432. As a result, the non-occurrence of a regulatory amendment was not a basic assumption of the contracts at issue. *Id.* at 907, 116 S.Ct. 2432.

The non-occurrence of a slump in the timber market was not a basic assumption of the What contract. Seaboard contracted to harvest timber at a fixed price. "The normal risk of a fixed price contract is that the market price will change." *N. Ind. Pub. Serv.,* 799 F.2d at 275. Seaboard bet that the timber market would remain strong. The government, in contrast, insulated itself from the market's downward movement. Thus, the non-oc-currence of market fluctuation was not a basic assumption of both parties in this case. *See Karl Wendt Farm Equip. Co. v. Int'l Harvester Corp.,* 931 F.2d 1112, 1118 (6th Cir.1991) ("[N]either market shifts nor the financial inability of one of the parties changes the basic assumptions of the contract such that it may be excused under the doctrine of impracticability. To hold otherwise would not fulfill the likely understanding of the parties as to the apportionment of risk under the contract." (citation omitted)).

■ Moreover, while the occurrence of a market slump cannot be Seaboard's fault, no impossibility defense will lie where the "language or the circumstances" indicate allocation of the risk to the party seeking discharge. *Winstar Corp.,* 518 U.S. at 908, 116 S.Ct. 2432 (quoting Restatement (Second) of Contracts § 261). Because Seaboard entered into a fixed-price contract, it carried the risk that the market would slump. *Tangfeldt Wood Prods., Inc. v. United States,* 733 F.2d 1574, 1577–78 (Fed.Cir.1984) (holding that timber contractor bore the general risk of changing market prices and could not be deemed compelled to defer removal simply by the fact of low prices). Therefore, because the non-occurrence of a market slump was not a basic assumption of both parties and Seaboard bore the risk, Seaboard's impossibility defense fails as a matter of law. The Court of Federal Claims' rejection of both the impossibility and commercial impracticability defenses was thus correct.

### c. Frustration of Purpose

■ Seaboard alternatively argues that it was relieved from performance under the "frustration of purpose" doctrine because the market slump made performance of the What contract unprofitable, thereby frustrating the purpose of the con-

tract. Our precedent recognizes that frustration of purpose is a non-performance defense that is distinct from impracticability:

> Although frustration and commercial impracticability are related, they deal with two different effects that unforeseen circumstances may have on performance. Under the frustration defense, the promissor's performance is excused because changed conditions have rendered the performance bargained from the promissee worthless, not because the promissor's performance has become different or impracticable. On the other hand, commercial impracticability excuses a promissor from performance because a supervening event changes the nature of the promissor's performance so that it has become commercially impracticable. Under frustration analysis the court is concerned with the impact of the event upon the failure of consideration, while under impracticability, the concern is more with the nature of the event and its effect upon performance.

*Everett Plywood Corp. v. United States,* 227 Ct.Cl. 415, 651 F.2d 723, 729 (1981). "The [non-performing party] bears a heavy burden in proving the defense of frustration." *Id.* To meet its burden, Seaboard must show that (1) a supervening event occurred that should excuse performance, (2) it did not bear the risk of the event, and (3) the event rendered the value of the performance worthless to Seaboard. *Id.*

Here, the determinative factor in assessing the frustration defense is whether Seaboard bore the risk of the change in market conditions. Seaboard entered into a fixed-price contract, risking a change in the market. *See Tangfeldt Wood Prods.,* 733 F.2d at 1577–78; *N. Ind. Pub. Serv. Co.,* 799 F.2d at 278 ("[A] fixed price contract is an explicit assignment of the risk of market price increases to the seller and

the risk of market price decreases to the buyer. . . ."). As seller, the government bore the risk that prices would rise. Seaboard cannot escape performance under frustration doctrine by arguing that its profit motive is frustrated. *See Karl Wendt Farm Equip.,* 931 F.2d at 1119–20. As a matter of law, Seaboard's frustration defense fails and the Court of Federal Claims did not err in rejecting that defense on this ground.

### d. Cow Contract Extension

CDC argues that the Court of Federal Claims erred in concluding that the Forest Service acted within the limits of its discretion in declining to grant CDC's request for a second extension of the Cow Contract and thus did not breach that contract. CDC argues that an abuse of discretion is shown by the fact that CDC fulfilled all the criteria for an extension of the Cow Contract, that its request for a second extension was never passed on to headquarters, and that there was nothing in the contract that limited contractors to a single one-year extension. We disagree with CDC's conclusion that the Forest Service abused its discretion in not granting a second term extension.

Although Forest Service regulations set out threshold criteria for granting term extensions, the regulations discourage the granting of extensions, stating "[e]xtensions of a contract term should be the exception rather than the rule. A timber purchaser is expected to complete contractual obligations during the specified contract term." Forest Service Manual § 2433.12a (June 27, 1984). Moreover, the Manual clearly states that "[e]xcept in unusual circumstances, only one extension shall be granted." *Id.* Given that guidance, it was well within the officer's discretion to decide that CDC's request was simply not meritorious and refuse to pass

it along, even if CDC technically met the threshold requirements for an extension. Thus, the Court of Federal Claims correctly concluded that the Forest Service acted within its discretion in declining the second extension and that CDC is liable for breach of the Cow contract.

### 2. Damages

Seaboard argues that the damages judgments against it should be vacated for several reasons. First, Seaboard argues that as a matter of law, the holding in *United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914), bars the government's counterclaims for damages on the What, Bride, Pearl, Ram, and Cow contracts because the government resold these contracts on materially different terms, and that the Court of Federal Claims erred in holding otherwise. Alternatively, appellants argue that even if *Axman* does not bar the counterclaims, the government bore the burden of proving the effect of each change on the price of each resale contract, the court erred in allocating that burden to Seaboard, and because the government did not meet its burden, each damage counterclaim must fail. Lastly, Seaboard argues that even if the government met its burden on damages, the Court of Federal Claims' adjustment of each damage award was clearly erroneous based on the evidence properly in the record. We affirm the Court of Federal Claims' disposition of each issue.

#### a

■■■■ The *Axman* defense provides a complete bar to damages where the non-breaching party, in attempting to mitigate damages, resells a contract on materially different terms than those of the original contract. *Schwartz v. United States*, 106 Ct.Cl. 225, 65 F.Supp. 391, 393 (1946) (citing *Axman*, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198, and *United States v. Cal. Bridge & Constr. Co.*, 245 U.S. 337, 53 Ct.Cl. 620, 38 S.Ct. 91, 62 L.Ed. 332 (1917)). Where terms are materially different, the resale is not a reasonable measure of damages and "cannot be used for the measure of recovery." *Axman*, 234 U.S. at 43, 34 S.Ct. 736. Whether the terms of a resale contract are materially different from those of the original contract in the meaning of *Axman* is a question of law. *Schwartz*, 65 F.Supp. at 393. The Court of Federal Claims held that the changes at issue—the new down payment requirements, the midpoint payment requirements, and the timber harvesting periods—were not materially different terms within the meaning of *Axman*:

> The beginning point for applying this analysis is to enquire whether, as in *Axman* itself, the changes substantially altered the *character* of the work. We find that they did not. The fundamental character of the work was the same—harvesting trees. There were no material changes in the way the work was to be performed.

*Seaboard II*, 48 Fed.Cl. at 822.

In *Axman*, the government contracted with Axman to dredge part of San Pablo Bay. 234 U.S. at 39, 34 S.Ct. 736. The contract called for Axman to deposit the spoil in a certain location. *Id.* Axman mistook the nature of the work, and to reduce his costs requested that the government allow him to dump elsewhere. *Id.* at 40, 34 S.Ct. 736. The government refused, Axman failed to perform, and the government re-let the contract. *Id.* at 40–42, 34 S.Ct. 736. In the new contract, however, the government gave the contractor the option to deposit spoil in the location that Axman requested. *Id.* at 42, 34 S.Ct. 736. The resale contract cost the government more money and it sued Axman for the difference. *Id.*

The Supreme Court held that the original contract "specifically made the place of dumping the spoil an essential and particular term of the contract." *Id.* at 43, 34 S.Ct. 736. "Dredging the channel would not be enough to show performance of his contract, unless [Axman] complied with the other material requirement as to the deposit of the spoil." *Id.* "[W]e think the change in the place of dumping the spoil was very material, and could not be made consistently with the terms of the agreement under which Axman undertook to perform the work or be liable...." *Id.* at 43–44, 34 S.Ct. 736. "[T]he work done under the second contract was not the work which the first contractor had agreed to perform." *Id.* at 45, 34 S.Ct. 736.

*Axman* and its progeny have a common thread. The cases in which the courts have barred a damage claim under *Axman* involved substantial and material changes in the physical nature of the performance, i.e., the work to be performed or the goods to be delivered, from the original contract to the re-let contract. *Consol. Airborne Sys., Inc. v. United States,* 172 Ct.Cl. 588, 348 F.2d 941, 947 (1965). *See also Cal. Bridge,* 245 U.S. at 344–45, 38 S.Ct. 91 (holding original contractor not liable for additional cost of re-let contract where significant changes were made to the construction specifications); *Schwartz,* 65 F.Supp. at 393 (holding that the government could not charge contractor excess cost of re-let contract where the re-let contract was for a more expensive communication system based on different technology than that provided under the original contract); *Rosenberg v. United States,* 76 Ct.Cl. 662, 677–79, 1933 WL 1837 (1933) (holding that the government could not charge contractor excess cost of re-let contract where the government's specifications were impossible to meet, government changed the specifications but did not change the price to be paid, original con-

tractor refused to perform, and new contractor was paid more to meet new specifications); *George Leary Constr. Co. v. United States,* 63 Ct.Cl. 206, 225–26, 1927 WL 2960 (1927) (holding that the government could not charge contractor excess cost of re-let contract where government caused a delay in contract performance in which contractor was to use his own equipment, original contractor's costs increased, and government refused to allow original contractor to perform at cost but allowed new contractor to use government equipment, and paid new contractor a different rate).

In contrast, where the changes in the resale contracts have involved changes in financial terms or only minor changes to performance, rather than substantial changes to the nature of the work performed, our precedent and that of our sister circuits hold that the *Axman* defense is unavailable. In *Consolidated Airborne,* this court's predecessor was presented with the question of whether changing only the quantity of goods purchased from the original contract to the resale contract made the contract so materially different that the original contractor could not be liable for the difference in the per unit costs of the goods. *Consol. Airborne,* 348 F.2d at 947–48. The Court of Claims held that changing the quantity of goods purchased did not suffice to establish a complete bar under *Axman. Id.* at 948. The Eighth Circuit held to similar effect in *American Surety Co. v. United States,* 317 F.2d 652, 656–57 (8th Cir.1963) (holding that changes in the quantity of units and the timing of delivery did not bar the government from using the resale contract as the measure of damages). In *Doehler Metal Furniture Co. v. United States,* 149 F.2d 130, 133 (2d Cir.1945), the Second Circuit held that the addition of a liquidated damages clause in the re-let

contract did not bring the case under *Axman*. The Second Circuit distinguished the simple addition of the liquidated damages clause from "relet contracts calling for performance of work of a kind substantially different from that which the first contractor had agreed to perform or for the delivery of goods of a substantially different character." *Id.*

In this case, there was little alteration in the nature of the work to be performed in the resale contracts. The substantive, physical work to be performed by the contractor in both the original and resale contracts in each case was the harvesting of the same timber. Changes to upfront payments, midpoint payments, time to perform, and other minor terms from the original contracts to the resale contracts in the record on appeal are more analogous to the financial and minor performance changes of *Consolidated Airborne* and *Doehler* than to the substantial changes to performance dealt with in *Axman* and its progeny. Therefore, we hold that appellants' *Axman* defense fails as a matter of law.

### b

■ The parties dispute the proper allocation of the burden to identify material differences in the resale contracts and to quantify their impact. The Court of Federal Claims concluded that this burden was properly on the contractor:

> Once the government has put forward a prima facie case that it has contracted for fundamentally the same work or goods and has implemented in a reasonable way the contract-specified method of assigning damages, the contractor then has the burden of showing that changes to the resale contracts either require adjustment to damages in a specific amount, or cannot be quantified and are sufficiently significant that they dic-

tate a rejection of the counterclaim altogether. The asserted deviation between the original and resale contracts becomes an affirmative defense, as to which the breaching party carries the burden of proof.

*Seaboard II,* 48 Fed.Cl. at 822.

Seaboard argues that the court erred in its allocation of this burden. It finds its chief support for this argument in *Doehler:*

> With respect to [the effect of the liquidated damage clause in the resale contract], we think that the burden of proof must be on the government. Had the second contract, except as to price, been the same in terms as the first, the price named in the second contract would be assumed to be reasonable, absent any contrary evidence. But such an assumption is unwarranted in the light of the additional clause. We cannot say that there is a strong probability that that clause did not raise the price; nor is it true that the facts are more accessible to Doehler than to the government; nor are there any policy grounds for not letting the burden rest where it ordinarily would rest, i.e., on the government, which, under the counterclaim, is asserting a claim against Doehler.

*Doehler,* 149 F.2d at 135. Seaboard argues that the court erred in determining that the rule in this circuit is directly contrary. The court based its determination on *Consolidated Airborne,* in which the Court of Claims held that "the burden is on the plaintiff as defaulting contractor to show not only that such [change] caused unreasonable expense but also the amount by which the excess costs were increased by unjustified expense." *Consol. Airborne,* 348 F.2d at 948. Seaboard maintains that the factual situation in *Consolidated Airborne* is distinguishable in that the original contract in that case granted the contracting officer broad discretion to

conduct reprocurement of the articles "upon such terms and in such manner as the Contracting Officer may deem appropriate." *Id.* This placed the reduction in quantity in the resale contract "within the contemplation of the parties." *Id.* Seaboard argues that the lack of such discretionary language in the resale contracts in this case makes the rule of *Consolidated Airborne* inapposite. Seaboard urges that we instead follow *Doehler* and place the burden of proving the impact of the changed terms on the government.

The government responds that the Court of Federal Claims properly allocated the burden, not only on the basis of *Consolidated Airborne* but also *Miller v. United States,* 106 Ct.Cl. 239, 249 (1946) (holding that the burden to show that reprocurement did not subject the government to excess costs was on the plaintiff contractor). The original contract in *Miller* did not grant discretion to the contracting officer in conducting reprocurement. The government does not otherwise address Seaboard's argument that *Consolidated Airborne* is distinguishable on the basis of the discretionary contract language.

■ The Court of Federal Claims did not err in its allocation of the burdens in this case. *Doehler,* the case Seaboard chiefly relies upon, is not the law in this circuit. In *Consolidated Airborne,* our predecessor court held that where the original contract contained discretionary language granting broad latitude to the contracting officer in conducting reprocurement, the burden of proving the effects of changes in the reprocurement contract on costs is properly borne by the breaching contractor. Seaboard urges us to infer from that holding that where the original contract does not contain such discretionary language, the burden of proof should be placed on the non-breaching par-

ty, the government. Such an inference is not justified in view of the holding of our predecessor court in *Miller.* In that case, the original contract contained no language granting discretion in reprocurement to the contracting officer, providing only that:

> the Government reserves the right to terminate the right of the contractor to proceed and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the Government thereby.

*Miller,* 106 Ct.Cl. at 242. This contractual language is similar to the governing provision in *Doehler,* which provided that, in the event of termination by the government for failure to make deliveries:

> the Government may purchase similar materials or supplies in the open market or secure the manufacture and delivery of the materials and supplies by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby.

*Doehler,* 149 F.2d at 131. However, in *Miller,* the Court of Claims held that the burden to prove the effects of alleged changes in the contract was properly on the breaching contractor, not on the government:

> [The contractor] suggests that the articles purchased by the Government were not similar to those which plaintiff had contracted to furnish, and, therefore, that proof that they cost more is not sufficient to show that the defendant was put to excess cost. If this is so, the burden is clearly on the [contractor] to show it. If he does not show it, he has not proven that excess costs were improperly deducted.

*Miller,* 106 Ct.Cl. at 249. Thus, in this circuit, where a contractor's breach results in the necessity for reprocurement of substantially similar goods or services, the burden of proving the effects of changes in the reprocurement contract terms on the contract price is properly placed on the breaching contractor.

c

After hearing extensive testimony on the impact of changes in contractual terms, the Court of Federal Claims found that, in the What sale, a fair and reasonable estimate of the impact of the down payment requirement was ten percent of the bid price, and that the impact of the decrease in contract term should likewise be estimated at ten percent of the bid price. *Seaboard II,* 48 Fed.Cl. at 836. The court also found that the impact of the down payment requirement in the Bride, Cow, Pearl, and Ram contracts was five percent of bid price, and that the impact of the change in contract term on resale of the Bride contract was twenty percent of bid price. *Capital Dev.,* 49 Fed.Cl. at 184–85. The court applied these percentages in reducing the amount awarded to the government on its counterclaims.

Seaboard argues that the Court of Federal Claims clearly erred in its calculation of the discounts attributable to the changed cash down payment requirements and decrease in contract term. Seaboard maintains that the court abused its discretion in admitting the testimony of Scott Olmstead ("Olmstead"), an expert witness for the government, because his testimony did not meet the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Seaboard also argues that the Forest Service negligently performed its cruise of the What timber volume, resulting in an understated timber volume and thereby breaching a warranty

of reasonable accuracy. Seaboard further argues that the court's discount for the cash down payment terms was based only on speculation by one witness, while the court's discount for the shortened contract terms was unsupported by any evidence in the record.

The government responds that the Supreme Court was concerned in *Daubert* with emphasizing the gatekeeping role of the trial judge in preventing jurors from being presented with dubious opinions lacking a sound scientific basis. The government argues that these concerns are not implicated in a bench trial, so that *Daubert* is inapposite here. The government maintains that Olmstead's testimony would meet the *Daubert* standard in any case, because the trial judge relied on Olmstead's testimony only with respect to the time value of money, a concept that is generally accepted within the accounting community. The government further argues that the statement of timber volume in the original What sale was not a guarantee, and even if the Service had breached a warranty of accuracy, Seaboard was not harmed thereby, because Seaboard failed to perform solely because of poor market conditions, not because of insufficient time to harvest the timber. Furthermore, the government argues that the court did not err in estimating the impact of the changed contractual provisions, because precedent in this circuit allows a trial court to fashion an estimate of damages where they cannot be precisely measured.

In *Daubert,* the Supreme Court reaffirmed that the trial judge is to screen scientific evidence for relevance and reliability. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. A concern underlying the rule in *Daubert* is that without this screening function, the jury might be exposed to confusing and unreliable expert testimony.

*Id.* at 597, 113 S.Ct. 2786 ("[A] gatekeeping role for the judge ... on occasion will prevent the jury from learning of authentic insights and innovations."). Furthermore, the Court stated that, in assessing scientific testimony, the judge should also be mindful of, inter alia, Fed.R.Evid. 403 (permitting the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of ... misleading the jury"). *Id.* at 595, 113 S.Ct. 2786. While these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place, the *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met. In this case, Seaboard attacks the forecasting methodologies Olmstead employed, but the Court of Federal Claims found that Olmstead's "overall methodology ... was like that of the Service." *Seaboard II*, 48 Fed.Cl. at 824. The court accepted the common "underlying premise" of both parties' analysis, that "one means of estimating the financial impact of the changes is to measure the time value of money," and characterized the weaknesses of Olmstead's methods as going "only to the fine tuning of a relatively minor credit." *Id.* Under these circumstances, the admission of Olmstead's testimony was not an abuse of discretion.

■■■ Furthermore, we disagree with Seaboard's contention that the Service breached a warranty of accuracy in including understated timber volumes in the What sale prospectus. Contrary to Seaboard's contention, the prospectus for the What sale clearly states that "[i]nformation listed herein is made available with the understanding that values shown are not estimates of a purchaser's own recovery and are not a part of the timber sale contract." Seaboard has not directed our attention to any contractual language establishing a warranty of accuracy for the timber volume estimates. It is settled law that, absent such contractual language, the Forest Service's timber estimates are not guarantees of the purchaser's recovery. *Caffall Bros. Forest Prods., Inc. v. United States*, 230 Ct.Cl. 517, 678 F.2d 1071, 1080 n. 23 (1982) (characterizing the existence of an "implied warranty" of a certain volume of timber as having "no support in fact, law, or logic").

■■■ Moreover, we hold that the Court of Federal Claims did not clearly err in its calculation of the impact of the changed cash down payment terms. It is well settled that the evidentiary basis for a court's ruling on damages need only be "sufficient to enable a court or jury to make a fair and reasonable approximation." *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 355 F.2d 554, 572 (1966). The amount of damages need not be "ascertainable with absolute exactness or mathematical precision." *Elec. and Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969) (noting that "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science"). "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir.2000) (quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). The evidence presented in this case was extensive and permitted the court to make a fair and reasonable approximation of the effect of the change in the down payment terms. The court heard expert evidence in both the *Seaboard* and *Capital Development* cases, not only from Olmstead, but also from Seaboard's experts Douglas Rideout and Paul Ehringer, as well as Randall Rucker, the government's witness who critiqued Rideout's analysis. Seaboard directs our atten-

tion to Rideout's conclusion that the down payment requirement in the What contract "had the effect of depressing resale prices by at least 25 percent." *Seaboard II*, 48 Fed.Cl. at 826. However, Rideout's inability to explain convincingly why "the true cost of a down payment which will ultimately be recovered is more than the down payment itself," *id.* at 826–27, coupled with Rucker's critique of Rideout's methodology, left the court with "no real confidence in Professor Rideout's judgment that the impact of the financial changes was 'at least twenty five percent.'" *Id.* at 828. Ultimately, the trial court based its finding as to the impact of the cash down payment requirement on the time value of money approach, which Rideout conceded had "some viability." *Id.* at 825. The court found that, based on Rideout and Ehringer's testimony, as well as Rucker's opinion that the impact of the down payment was less than ten percent of the bid price, the impact was somewhat in excess of the time value of money, and estimated the impact at ten percent of the bid price. *Id.* at 836. The court adopted the same analysis in the *Capital Development* case, estimating the impact at five percent. *Capital Dev.*, 49 Fed.Cl. at 184. Although it is clear that the court was estimating the impact of the changed terms, this is permissible under our precedent. We discern no clear error in the court's reasoning.

Neither did the court clearly err in its assessment of the impact of the shortened contract term. In the *Seaboard* case, the court heard testimony from Paul Ehringer, Seaboard's expert, on the effect of the "What" resale, which he characterized as "substantially truncated by comparison with other contracts." *Seaboard II*, 48 Fed.Cl. at 832. Rideout also testified that the "shorter the contract, the less flexibility there is for the purchaser." *Id.* The court found that "the shorter contract term has an impact, albeit unquantified, on what bidders are willing to pay for a contract." *Id.* at 835–36. Although the impact of the shortened contract terms was unquantified, it is not necessary that the amount be calculable with mathematical precision. *Elec. and Missile Facilities*, 416 F.2d at 1358. We are not persuaded that the court clearly erred in estimating the impact of the changes in contract terms based on the evidence presented.

## CONCLUSION

We affirm the Court of Federal Claims' rejection of the nonperformance defenses of force majeure, impossibility of performance, commercial impracticability, and frustration of purpose as a matter of law. We affirm the Court of Federal Claims' conclusion that the Forest Service acted within its discretion in declining the second extension on the Cow contract. With respect to damages, we affirm the determination of the Court of Federal Claims that Seaboard and CDC were not excused from performing under the *Axman* rule and that the burden of proving the effects of changes in the reprocurement contract terms on the contract price was properly placed on the breaching contractors. We affirm the Court of Federal Claims' admission of Olmstead's evidence as within the court's discretion. We also affirm the court's determination that the government did not breach a warranty of reasonable accuracy in its timber volume estimates. Finally, because the Court of Federal Claims did not clearly err in its findings with respect to damages, we affirm those findings.

*AFFIRMED.*