NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**AHMED HALIM,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Appellee*

---

2019-1478

---

Appeal from the United States Court of Federal Claims in No. 1:12-cv-00005-EDK, Judge Elaine Kaplan.

---

Decided: May 12, 2020

---

CARL COAN, III, Coan & Lyons, Washington, DC, for plaintiff-appellant.

TANYA KOENIG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by JOSEPH H. HUNT, KENNETH DINTZER, ROBERT EDWARD KIRSCHMAN, JR.

---

Before O'MALLEY, BRYSON, and CHEN, *Circuit Judges.*

BRYSON, *Circuit Judge.*

In 2006 and 2007, plaintiff Ahmed Halim purchased several apartment complexes from the Department of Housing and Urban Affairs ("HUD") at foreclosure sales in various cities.  Mr. Halim entered into a series of contracts with HUD relating to his purchase and operation of the properties.  Disputes arose with regard to Mr. Halim's proposal to self-manage one of the properties and his failure to complete repairs at the other three properties and to maintain the housing units at those properties in habitable condition.  Based on its determination that Mr. Halim had breached his contractual obligations regarding the repair and maintenance of three of the properties and his failure to make satisfactory arrangements for the management of the fourth property, HUD retained funds that Mr. Halim had deposited pursuant to the contracts.  Mr. Halim filed this action in the United States Court of Federal Claims ("the Claims Court") challenging HUD's retention of those funds.  The Claims Court granted summary judgment to the government with respect to Mr. Halim's claims relating to all four properties.  We affirm.

I

The first of the four properties addressed by the Claims Court was a 24-unit apartment complex in Flushing, Ohio, called the Nichols Townehomes Apartments.  HUD held a foreclosure sale for the property in 2006.  HUD advertised the foreclosure sale through a "bid kit."

The bid documents provided that the successful bidder would be required to submit a $50,000 earnest money deposit immediately after the foreclosure sale.  The bid documents also provided that the successful bidder would be required to submit certain forms relating to the bidder's ability to manage the property appropriately.  If HUD

determined that the bidder/owner was unqualified to self-manage the property, HUD could require the bidder/owner to obtain the services of a qualified property management firm.  If the bidder/owner failed to retain those services, HUD was entitled to reject the bid and retain the bidder's earnest money deposit.  The successful bidder was required to sign a copy of an agreement entitled "Terms and Requirements of Foreclosure Sale—Acknowledgement by Bidder" that mirrored those requirements described in the bid documents.

Mr. Halim was the high bidder on the property.  He signed the "Terms and Requirements of Foreclosure Sale—Acknowledgement by Bidder" agreement and submitted the $50,000 earnest money deposit.

Mr. Halim advised HUD that he intended to self-manage the property, and he submitted various forms in support of his request to be permitted to manage the property without an independent management firm.  After receiving the forms, HUD advised Mr. Halim that he had failed to demonstrate that he or his management company had the experience required to manage the property.  Among other problems, HUD advised Mr. Halim that several of the forms were "incomplete or . . . in need of correction/clarification."  In addition, HUD noted that Mr. Halim's statement in support of his intention to self-manage the property "does not indicate any previous experience in Project Based Section 8 [federally subsidized] housing, nor did you include any experience of company staff."  HUD therefore advised Mr. Halim that he needed to retain a property management firm and that if he did not, HUD would reject his bid and retain his earnest money deposit.

Mr. Halim did not retain a property management firm as directed.  Instead, he submitted revised forms to HUD in support of his request to self-manage the property.  HUD concluded that the submitted documents, even as revised, failed to demonstrate that he was qualified to manage the

property.  HUD therefore rejected his bid and retained his earnest money deposit.

The parties filed cross-motions for summary judgment. Mr. Halim argued that HUD acted in bad faith when it refused to permit him to self-manage the Nichols Townehomes property and canceled the sale.  For that reason, he argued, HUD breached the contract's implied covenant of good faith and fair dealing.

The Claims Court rejected that argument.  It noted that in order to demonstrate bad faith, Mr. Halim was required to show by clear and convincing evidence that HUD had the specific intent to injure Mr. Halim.  The court held that Mr. Halim had not pointed to any evidence of bad faith on HUD's part.  In addition, the court noted that Mr. Halim offered no evidence in support of his "bald assertion" that the forms he submitted in support of his request to self-manage the Nichols Townehomes property were "essentially the same" as the forms he had submitted in connection with other properties that he had been permitted to self-manage.  The court added that Mr. Halim had offered no evidence that the contexts in which the forms were submitted in connection with the other properties were comparable to the Nichols Townehomes.  The court therefore denied Mr. Halim's summary judgment motion and granted summary judgment to the government with respect to that property.

Before this court, Mr. Halim has not pressed his "bad faith" claim.  Instead, he argues that HUD's rejection of his request to self-manage the property was arbitrary and capricious because HUD had allowed him to self-manage other properties.  Before the Claims Court, however, Mr. Halim did not advance his current argument that HUD's actions were arbitrary and capricious.  To be sure, at one point in his opposition Mr. Halim stated that HUD's actions were "arbitrary and made in bad faith."  But the "arbitrary and capricious" argument was wholly undeveloped.

And Mr. Halim has not addressed the government's contention that in the trial court he argued that HUD had acted in "bad faith," while on appeal he argues that HUD acted "arbitrarily and capriciously." As such, we deem that argument waived. *See Fresenius USA, Inc. v Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal.").

We also reject the "arbitrary and capricious" argument on the merits. Mr. Halim's entire argument is based on a short declaration created in connection with the litigation. In that declaration, Mr. Halim stated that HUD had approved him to self-manage five other properties, and that he was managing two of those properties at the time he submitted his bid on the Nichols Townehomes Apartments. He also stated that at least two of the forms he submitted to HUD to demonstrate his qualifications to self-manage the other properties were "essentially the same" as the version of those forms he submitted for the Nichols Townehomes Apartments.

Mr. Halim contends that because HUD allowed him to self-manage other HUD properties, it was required to permit him to self-manage this one. We disagree. The picture Mr. Halim paints, even viewed in the light most favorable to him, is not one of unfair conduct of the sort necessary to make out his claim of breach of an implied covenant. Mr. Halim does not address the merits of HUD's decision not to permit him to self-manage the Nichols Townehomes, except to argue that HUD's action in the case of the Nichols property was inconsistent with its actions in the case of other properties that he was allowed to self-manage. Yet the contract made clear that the decision whether to allow an owner to self-manage a property was within HUD's discretion. Rather than proving improperly restrictive conduct on HUD's part, Mr. Halim's declaration may simply

show that HUD treated him more leniently than it was required to with respect to those other properties.

Contrary to Mr. Halim's argument, HUD's decisions with respect to each property must be assessed based on the circumstances relating to that particular property. Mr. Halim has not provided any evidence that the circumstances relating to the Nichols property are comparable to the circumstances relating to any of the other properties.

Moreover, the fact that HUD may have permitted an owner to self-manage in one case cannot, in effect, estop the agency from concluding in another case that the owner should not be permitted to self-manage the property, where there is no evidence of affirmative misconduct on the part of the agency. *See, e.g.*, *United States v. Ford Motor Co.*, 463 F.3d 1267, 1278–79 (Fed. Cir. 2006); *Dantran, Inc. v. U.S. Dep't of Labor*, 171 F.3d 58, 66–67 (1st Cir. 1999).

In short, Mr. Halim failed to demonstrate that HUD's decision with respect to this particular property was an impermissible exercise of its discretion. The Claims Court correctly ruled that the government was entitled to summary judgment that the government did not breach its agreement with Mr. Halim when it exercised its right to insist that he designate a management firm to manage the property rather than allowing him to manage the property himself.[1]

---

[1]    In passing, Mr. Halim says that because he did not submit one of his forms on time, his bid should have been rejected and his earnest money deposit refunded. According to Mr. Halim, that is another example of how HUD acted arbitrarily and breached its contract with him. It is not clear to us that Mr. Halim preserved that argument because it directly contradicts his allegations in the complaint. *See* Fourth Amended Complaint at 5, *Halim v. United States*, Case No.1:12-cv-00005 (Fed. Cl. Jan. 9, 2015) ("Plaintiff timely submitted all of the documents he

## II

The second property addressed by the Claims Court was a 40-unit apartment complex in Schenectady, New York, known as the Schenectady 40 Apartments. HUD held a foreclosure sale for the property on May 31, 2006. The bid documents explained that the successful bidder would have to make certain specified repairs to the property to HUD's satisfaction within 24 months after closing. The attachment detailing the required repairs explained that the repairs would be considered completed only after (1) the purchaser provided written certification that the repairs were complete; (2) the purchaser requested a final inspection by HUD; and (3) HUD verified in writing that completion and compliance had been achieved. HUD estimated that the repairs would cost $1,614,336 and required the purchaser to deposit $403,584 in escrow as security for the repairs. In addition to requiring that certain enumerated repairs be completed, the bid documents separately said the purchaser would be responsible for making any other repairs necessary to meet applicable state and local codes.

Mr. Halim was the high bidder on the property at the HUD foreclosure sale. After the award, Mr. Halim entered into a Foreclosure Sale Use Agreement with HUD in July 2006. He agreed to complete the required repairs by July 2008 and secured a letter of credit for $403,584 to cover the repair escrow deposit. The agreement stated that "HUD may cash the [letter of credit] and apply the funds to correct latent defects in the completed repairs if the purchaser is unable or unwilling to make such repairs" within the required timeframe.

---

was required to submit to HUD . . . ."). In any event, Mr. Halim has not identified any authority requiring HUD to refund his deposit under those conditions.

In addition, Mr. Halim entered into a Housing Assistance Payment ("HAP") contract with HUD. As part of that arrangement, Mr. Halim agreed to bring all the units into compliance with HUD's Uniform Physical Condition Standards ("UPCS"). Unlike the other repairs Mr. Halim agreed to make, any UPCS repairs needed to be completed within 180 days. The parties' agreement, however, required that after the initial 180-day grace period all the units had to be maintained "in good and tenantable condition, and in accordance with the UPCS" at all times during the HAP contract. Once the UPCS repairs were completed, Mr. Halim could begin billing HUD for HAP payments, which are subsidies that cover a portion of the tenants' rent. HUD could inspect the units whenever it deemed it necessary to assure itself that the units were being maintained in compliance with the UPCS. If HUD determined that a single unit was not in compliance with the requirements of the UPCS, HUD could exercise any of its remedies under the parties' agreement for "all or any" units subject to the HAP agreement. Those remedies included termination of the HAP agreement and recovery of any overpayments.

An inspector designated by HUD conducted several inspections of the property to determine whether the post-closing repairs had been completed and whether the units complied with the UPCS.[2] By March 2008, only 32 percent of the required post-closing repairs had been done.

---

[2]    HUD's inspector created two types of reports. In his "post-closing inspection" reports, he detailed how many of the repairs specified in the Foreclosure Sale Use Agreement had been completed. In his "UPCS inspection" reports, he detailed the extent of compliance with the UPCS, as required by the HAP agreement. We will likewise refer to "post-closing" repairs and UPCS inspection results separately.

In November 2008, HUD issued a formal notice that Mr. Halim was in breach of the Foreclosure Sale Use Agreement. HUD gave him an additional 12 months to perform the necessary repairs, but it added a condition to obtaining that extension. HUD required Mr. Halim to submit within 10 days of the letter a schedule for the satisfactory completion of all required repairs. HUD said that if it did not receive a response and/or schedule that was acceptable to the department within 10 days, HUD would take legal action, including retention of the cash held in the repair escrow.

In response to the notice, Mr. Halim offered to schedule a follow-up inspection, but he apparently did not offer a proposed schedule of repairs. HUD's inspector completed a two-day follow-up inspection on April 1, 2009. Only one of the 40 apartments passed the UPCS inspection. With respect to the post-closing repairs, the inspector noted that there had not been any substantial improvements since the previous inspection that had occurred more than a year earlier.

On June 22, 2009, HUD sent Mr. Halim a notice of default on the HAP agreement that directed him to correct all deficiencies within 30 days. A follow-up inspection in August 2009 determined that none of the 40 apartments passed the UPCS inspection. Only 38 percent of the post-closing repairs had been completed by that time.

HUD subsequently terminated the HAP contract with Mr. Halim. HUD also retained $248,856 from the repair escrow, based on HUD's estimate that Mr. Halim had completed only 38 percent of the required post-closing repairs. In his complaint before the Claims Court, Mr. Halim alleged that HUD's retention of those funds breached the Foreclosure Sale Use Agreement. The complaint also alleged that Mr. Halim had maintained the Schenectady 40 property in accordance with UPCS, and that HUD had therefore improperly terminated the HAP agreement.

The government moved for summary judgment based on Mr. Halim's failure to complete the contractually required repairs by the specified deadline and his failure to maintain the units in compliance with the UPCS. Mr. Halim's opposition again rested almost entirely on the short declaration that he filed in connection with this litigation. In that declaration, Mr. Halim asserted, without any corroborating evidence, that he "completed all of the required repairs [at the Schenectady 40 property] by October 2009." He also stated that all the Schenectady 40 units had passed a UPCS inspection and that HUD was sending him subsidy payments for all 40 units. Mr. Halim also pointed to an October 2009 letter from the City of Schenectady's Bureau of Code Enforcement that stated that the units comprising the Schenectady 40 property had passed the city's inspection and had no outstanding code violations.

The Claims Court granted the government's motion, ruling that Mr. Halim's declaration was insufficient to avoid summary judgment as to the Foreclosure Sale Use Agreement, because his declaration was "conclusory and uncorroborated by any supporting documentation." Even if the declaration were credited, the court added, it would not be enough to avoid summary judgment. Mr. Halim stated in the declaration that he completed the repairs by October 2009. The Claims Court found that assertion to be immaterial because the deadline for completing post-closing repairs was in July 2008.

The court also granted the government's motion for summary judgment as to Mr. Halim's claim under the HAP contract, which required that each of the units be maintained in accordance with the UPCS at all times. Because the facts were not in dispute that the property was not in compliance with the UPCS as of the final deadline set by HUD in July 2009, the court held that HUD was entitled to terminate the HAP contract at that time.

1

We first address Mr. Halim's argument regarding the post-closing repairs. He contends that the Claims Court erred in granting summary judgment for the government, because his declaration that he had completed all the repairs by October 2009 created a genuine issue of material fact. In addition, he relies on the letter from the city Bureau of Code Enforcement, which stated that as of October 9, 2009, the Schenectady 40 properties had "no outstanding violations" and that "every property has passed inspections."

Neither of those documents creates a disputed issue of material fact as to whether Mr. Halim timely completed the post-closing repairs. First, we agree with the trial court that Mr. Halim's conclusory assertion in his declaration that he completed the work by October 2009 is not sufficient to create a genuine issue of material fact, in light of the substantial evidentiary showing to the contrary made by the government. *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). Second, Mr. Halim was required to complete certain enumerated post-closure repairs to HUD's satisfaction, and he was separately required to make any repairs necessary to meet applicable state and local codes. The fact that the property may have complied with particular unspecified local code requirements does not speak to whether Mr. Halim had completed the repairs enumerated in the Foreclosure Sale Use Agreement to HUD's satisfaction.

Even if Mr. Halim had completed the post-closing repairs by October 2009, that fact was not material. The Foreclosure Sale Use Agreement required Mr. Halim to complete the post-closing repairs by July 2008. Mr. Halim's assertions in his declaration provide no basis for denying summary judgment to the government, because it contains no representation that the post-closing repairs were completed before October 2009, long after the July

2008 contractual deadline for those repairs to be completed.

We agree with the trial court that the July 2008 deadline was not extended. Although HUD's November 2008 notice of default on the Foreclosure Sale Use Agreement provided Mr. Halim with the opportunity to obtain a 12-month extension, that extension was conditioned on the receipt of a satisfactory plan for the schedule of the remaining repairs. Mr. Halim did not present any evidence that he ever submitted a proposed schedule of repairs.[3]

Mr. Halim argues that the fact that HUD conducted inspections after July 2008 "raised an inference that the deadline was extended." That argument is a non sequitur. HUD set a deadline to correct certain deficiencies. The fact that HUD inspected the property after the deadline to see if Mr. Halim had complied with the contractual requirements does not raise an inference that the deadline was extended.

In sum, HUD was within its rights to retain funds from the repair escrow because Mr. Halim did not timely complete the required post-closing repairs. The government was therefore entitled to summary judgment that Mr. Halim breached the Schenectady 40 Foreclosure Sale Use Agreement.

2

We also agree with the Claims Court that there was no disputed issue of material fact regarding Mr. Halim's asserted failure to maintain the Schenectady 40 property in accordance with HUD's Uniform Physical Condition

---

[3]    Even if the deadline were assumed to run from the notice of default on the HAP contract, Mr. Halim's alleged post-closing repairs would still be untimely. The letter declaring a default on the HAP contract set a deadline of July 2009.

Standards.  The government points to numerous inspections that revealed a failure to comply with those standards throughout the entire period from the closing in 2006 until late 2009, in violation of the HAP agreement.  In response, Mr. Halim relies on the letter from the City of Schenectady's Bureau of Code Enforcement regarding the absence of city code violations as of October 2009.

That document does not address the question whether the property was in compliance with HUD's Uniform Physical Condition Standards during the three-year period leading up to that date.  As the trial court explained, HUD's Uniform Physical Condition Standards differ from local housing codes; even if the property complied with some unspecified city housing code requirements as of October 2009, that does not establish that the property was in compliance with the UPCS as of that date or throughout the period between 2006 and 2009.  Furthermore, the date of the letter is October 9, 2009, well after the thirty-day deadline set by the June 22, 2009 notice of default on the HAP agreement.[4]

Moreover, Mr. Halim's allegation that all units had passed "an inspection" and that HUD was making HAP subsidy payments on all 40 units before HUD terminated the HAP agreement does not give rise to a genuine issue of material fact.  HUD's remedies under the HAP agreement included the "recovery of overpayments."  Thus, even if HAP did pay a subsidy for a unit, that does not lead to the conclusion that the unit was in compliance with the UPCS. We also agree with the government that Mr. Halim's conclusory assertions in his declaration that all units had

---

[4]    Mr. Halim also contends that HUD breached the implied covenant of good faith and fair dealing by not conducting another investigation after the city's letter in October 2009.  We disagree.  HUD had no obligation to reinspect the premises after it determined that Mr. Halim had failed to comply by the relevant deadline.

passed "an inspection" and that he was receiving subsidy payments are not sufficient to create a genuine issue of material fact, in light of the substantial evidentiary showing to the contrary made by the government. *Barmag*, 731 F.2d at 836.

Mr. Halim asserts in passing that HUD was not entitled to terminate the HAP agreement "until HUD provided the tenants at Schenectady 40 an opportunity to comment on the proposed termination of the HAP contract," which HUD allegedly has not done. Mr. Halim waived that argument by not raising it below, *Fresenius*, 582 F.3d at 1296, and in any event, any violation of the tenants' rights does not somehow negate the effect of his breach.

We therefore uphold the trial court's ruling that the government was entitled to summary judgment that HUD's termination of the HAP contract on the Schenectady 40 property was not a breach of Mr. Halim's rights under that contract.

## III

The third property addressed by the trial court was the Meadowbrook Apartments, a 51-unit apartment complex in Meridian, Mississippi. Mr. Halim was the successful bidder on that property at a HUD foreclosure sale. The parties closed on the property in January 2007. The Foreclosure Sale Use Agreement that the parties executed required Mr. Halim to complete certain repairs to HUD's satisfaction within 24 months of closing. HUD estimated the cost of repairs to be $2,003,276. Mr. Halim obtained a letter of credit in the amount of $513,967 as security for his performance of the repair requirements. In addition, the parties entered into a HAP contract that required Mr. Halim to keep all units for which he would be receiving housing assistance payments in "good and tenantable condition" and in compliance with the UPCS requirements at all times. The HAP contract also provided that if HUD determined that any unit was not in accordance with the

UPCS, HUD could exercise its remedies under the contract for all or any of the units, including terminating the contract and the HAP payments.

The HUD-designated inspector conducted more than two dozen inspections of the property over the course of several years following Mr. Halim's purchase of the property in January 2007. The inspections included post-closing repair inspections and UPCS inspections. No more than 24 of the 51 units ever passed the UPCS inspections, and none of the inspection reports reflected that Mr. Halim completed all the required post-closing repairs.

In early 2009, HUD served Mr. Halim with a notice of violation of the Foreclosure Sale Use Agreement for failing to meet the 24-month repair deadline. In the notice, HUD stated that it was aware that the City of Meridian had declared Meadowbrook unfit for habitation and that the city intended to demolish the apartment complex if Mr. Halim did not show an "earnest intent to correct the property" to meet the minimum requirements of the city's housing code. On May 4, 2009, HUD issued a notice of default and stated that it was prepared to cash Mr. Halim's letter of credit.

In response, Mr. Halim requested a one-year extension, stating that he had retained a new contractor and promising to complete the work within that period. The Chief Administrative Officer of the City of Meridian contacted HUD to support the one-year extension request. Based on that endorsement and Mr. Halim's response, HUD agreed to grant an extension until January 31, 2010. HUD conducted regular inspections of the property during that one-year period. It determined that while some progress was made, much remained undone. Based on a final inspection six days before the expiration of the one-year extension, HUD determined that only 38 percent of the required post-closing repairs had been completed. At no point did all the units pass a UPCS inspection.

In March 2010, Mr. Halim requested, and HUD granted, a second one-year extension, until January 15, 2011, to complete the repairs. HUD granted that second extension in part based on the fact that the City of Meridian had granted Mr. Halim until that date to bring the property into compliance with the city's housing codes. Both the city and HUD told Mr. Halim that no further extensions would be granted.

During that year, Mr. Halim made some progress on the repairs, and HUD released a substantial portion of the funds it held in the repair escrow on account of that progress. An inspection on December 20, 2010, however, showed that while some progress had been made, a substantial amount of the required post-closing repairs remained undone. And only 24 of the 52 units passed the UPCS inspection at that time. A city official and Mr. Halim were present at that inspection, and the city official reminded Mr. Halim that he had to complete work by January 15, 2011, because the city would not grant Mr. Halim any further extensions.

Following the expiration of the second one-year extension, the City of Meridian issued a stop-work order on the property. HUD subsequently notified Mr. Halim that he violated the Foreclosure Sale Use Agreement and the HAP contract. Shortly thereafter, HUD terminated the HAP contract and retained the remaining portion of the escrowed funds.

In his complaint, Mr. Halim alleged that he had completed the post-closing repairs and that he had maintained the property in full compliance with HUD's Uniform Physical Condition Standards. In response to the government's motion for summary judgment, Mr. Halim abandoned his contention that he had completed the required repairs and argued, instead, that the stop-work order by the City of Meridian had rendered his performance impossible.

The parties filed cross-motions for summary judgment. The Claims Court granted the government's motion and denied Mr. Halim's motion. The court rejected Mr. Halim's impossibility argument on the ground that he had failed to show that it was objectively impossible to complete the repairs during the four-year period that he was given by HUD, including the two one-year extensions. In addition, the court explained that the defense of impossibility requires a demonstration of lack of fault on the part of the party asserting it. The court concluded that the unrebutted evidence showed that the stop-work order that Mr. Halim claims made it impossible for him to complete the repairs "was issued as a consequence of his own failure to meet the contractually imposed deadlines even after they were twice extended by a year."

On appeal, Mr. Halim continues to press his impossibility theory. He contends that because HUD did not issue its final notice of violation until December 2, 2011, he had until January 2, 2012, to complete the repair work. Because the stop-work order was in effect throughout much of the year leading up to that date, Mr. Halim argues that he was prevented, by causes beyond his control, from complying with his contractual obligations and therefore cannot be found to have been in breach of those obligations.

We disagree. The trial court was correct to conclude that Mr. Halim was directly responsible for the event that he claims rendered his performance impossible. That is, Mr. Halim's failure to complete the repairs at the property in a timely manner was what precipitated the city's stop-work order. His plea of impossibility is therefore not a viable defense to liability on the contracts. *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002).

Mr. Halim makes a further argument that there was a disputed issue of material fact as to whether he maintained the Meadowbrook property in accordance with HUD's

Uniform Physical Condition Standards. Mr. Halim's only evidence in support of that contention is that the Meadowbrook buildings received a certificate of occupancy from the city in early 2012. Whatever significance that fact may have had as to the property's compliance with city housing codes, it did not create a disputed issue of material fact as to whether all the units on the property complied with the separate requirements of the UPCS by the January deadline.

The trial court therefore properly granted summary judgment with regard to the Meadowbrook property.

## IV

The fourth of the properties as to which Mr. Halim has appealed was the Beacon Light—Goodwill Baxter Apartments ("Beacon Light"), a 108-unit apartment complex located in Henderson, North Carolina. HUD held a foreclosure sale for that property in June 2007. At the time of the sale, the property was vacant and in distressed condition. The bid documents warned bidders of the poor physical condition of the property, noting that it had been damaged by fire and vandalism. Although the bid documents identified numerous issues with the physical condition of the property, the documents warned that bidders were expected to arrive at their own conclusions as to the physical condition of the property as well as "any other factors bearing upon valuation of the property." HUD advised prospective bidders that the condition of the property and the need to repair it should be factored into the bid price.

Mr. Halim was the high bidder on the Beacon Light property and completed the purchase in August 2007. He entered into a Foreclosure Sale Use Agreement with HUD at that time. The agreement required Mr. Halim to make certain repairs on the property within 24 months of closing, to convert the property from rental units into home ownership, and to sell the repaired homes to income-eligible purchasers.

Following the sale, city officials in Henderson complained to HUD that Mr. Halim had not done any significant work on the property and that there had been several fires at the site. HUD subsequently contacted Mr. Halim in March 2009 and threatened to declare him in default of the Foreclosure Sale Use Agreement if the required repairs were not completed by the August 2009 deadline. Mr. Halim requested an extension to complete the required repairs. HUD informed Mr. Halim that it would consider a request for an extension only if he submitted a work plan indicating the date by which the repairs would be completed. The record does not reflect that Mr. Halim submitted such a plan.

Immediately before the expiration of the 24-month period for making the required repairs, the city's mayor contacted HUD again to complain that the property had been allowed to deteriorate significantly during the previous two years. The mayor explained that no plans had been submitted to bring the property into compliance with the city's housing code and that no work had begun on repairing the property. The city notified HUD that it had adopted an ordinance to condemn the property and would begin demolition unless the property could be brought into compliance with the housing code requirements.

After the 24-month deadline for repairs had passed, Mr. Halim applied to the city for a special use permit and a zoning variance. The Beacon Light buildings were set back 18 feet from the street, in violation of the applicable local code requiring that they be set back at least 35 feet. The city denied his requests. In so doing, the city zoning board noted that the setback requirement was "reasonably discernible at the time that the applicant purchased the property" and that "the Applicant has done nothing to remove the burned out buildings or attempted to remedy or repair the buildings since the fires . . . thus making the conditions worse."

Shortly before the city denied Mr. Halim's zoning requests, Mr. Halim sought to return the property to HUD and requested that his escrow deposit be returned to him. HUD, however, declined his request and instead notified him that he was in default of the Foreclosure Sale Use Agreement. HUD advised him that it intended to exercise its rights under the contract and to retain the deposited funds. HUD subsequently released approximately $400,000 from the escrowed funds to the city for the purpose of demolishing the property.

In his complaint, Mr. Halim alleged he was entitled to a refund of the purchase price of the property and the return of the repair escrow. He asserted that in light of the city's zoning ordinance regarding the setback requirements, he should be relieved of his contractual obligations under the doctrine of mutual mistake of fact.

The parties filed cross-motions for summary judgment. The Claims Court granted the government's motion and denied Mr. Halim's motion, rejecting Mr. Halim's mutual mistake argument. First, the court ruled that Mr. Halim's lack of due diligence made the doctrine of mutual mistake unavailable to him. Due diligence, the court concluded, would have led Mr. Halim to discover the setback ordinance and adjust his expectations, or decline to enter into the contract, particularly in light of Mr. Halim's experience in purchasing apartment complexes from HUD in foreclosure sales. Second, the court ruled that in connection with the Beacon Light purchase, the risk of encountering impediments such as zoning restrictions was placed on the purchaser. In particular, the court pointed out, the bid documents provided that prospective purchasers were "expected to acquaint themselves with the property, and to arrive at their own conclusions as to; physical conditions . . . and any other factors bearing upon the valuation of the property."

In his opposition to the government's summary judgment motion, Mr. Halim also argued that he was excused from the requirement of performance of his contractual obligations by the doctrine of impossibility. His performance under the contract was impossible, he contended, because the city's denial of a variance precluded him from performing. The Claims Court rejected that contention on two grounds. First, the court noted that Mr. Halim had not even applied for a variance until after the deadline for his performance had expired. Second, the court ruled that under his contractual arrangement with HUD, Mr. Halim "bore the risk that Beacon Light might not be in compliance with local zoning ordinances."

On appeal, Mr. Halim reprises his mutual mistake and impossibility arguments. As to mutual mistake, we agree with the trial court that with the exercise of due diligence Mr. Halim would have become aware of the zoning regulations. *See ConocoPhillips v. United States*, 501 F.3d 1374, 1380 (Fed. Cir. 2007) (citing *Restatement (Second) of Contracts* § 154 (1981)) ("a party bears the risk of a mistake when the party is aware, at the time the contract is made, that the party has only limited knowledge with respect to the facts to which the mistake relates but treats that limited knowledge as sufficient"); *Griffin & Griffin Exploration, LLC v. United States*, 116 Fed. Cl. 163, 175 (2014) ("[A] party cannot rely upon a mutual mistake of fact to avoid enforcement of a contract where, as here, the 'mistake' is a result of that party's failure to exercise due diligence."); *see also Collins v. United States*, 532 F.2d 1344, 1348 (Ct. Cl. 1976) ("Ignorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence.").

Moreover, the risk of unknown factors such as zoning regulations was expressly allocated to the purchaser. Zoning restrictions such as Henderson's fall within the category of "any other factors bearing upon the valuation of the

property." Where the parties have allocated the risk of mistake to one of the parties, that party may not invoke the doctrine of mutual mistake to avoid its contractual obligations. *See Dairyland Power Co-op v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). Mr. Halim's impossibility argument fails on the same ground. *Seaboard*, 308 F.3d at 1295 (citations omitted) ("[N]o impossibility defense will lie where the 'language or the circumstances' indicate allocation of the risk to the party seeking discharge.").

The Claims Court therefore properly granted summary judgment to the government with regard to the Beacon Light property.

**AFFIRMED**